JOHN K. BENNETT
JACKSON LEWIS LLP
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, New Jersey 07960
(973) 538-6890
          -and-
666 Third Avenue
29th Floor
New York, New York 10017
(212) 545-4000
Attorneys for Defendant

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

| | |
|---|---|
| AMY MEYERS,<br><br>               Plaintiff,<br><br>    -against-<br><br>MEDCO HEALTH SOLUTIONS, INC.,<br><br>            Defendant. | Hon. Richard J. Holwell, U.S.D.J.<br>Hon. Theodore H. Katz, U.S.M.J.<br><br>Civ. Action No. 09-cv-9216<br><br><br>**STATEMENT OF MATERIAL FACTS<br>AS TO WHICH THERE IS NO<br>GENUINE ISSUE TO BE TRIED** |

-------------------------------------------------x

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendant, Medco Health Solutions, Inc. ("Medco"), respectfully submits this Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried, as follows:

1.    On about March 30, 2004, Plaintiff received an offer of employment from Medco for the position of Director, Corporate Strategy and Business Development (Transcript of Deposition of Amy Meyers ("Meyers Dep. Tr."), 43-44; Exh. D-5).[1]  In this position, Plaintiff

---

[1] A true and correct copy of the portions of the Meyers Dep. Tr. cited herein is attached to the accompanying Certification of John K. Bennett ("Bennett Cert.") as Exhibit B.  True and correct copies of the exhibits marked at Plaintiff's deposition as Defendant's Exhibits D-5 through D-7, D-10, D-11, D-13, D-15, D-24, D-26, D-29, D-34,

reported to Laizer Kornwasser, then Medco's Vice President of Business Development (Meyers Dep. Tr., 42, 44).

2.      On April 12, 2004, Plaintiff signed a Key Employment Agreement (Meyers Dep. Tr., 45; Exh. D-6).

3.      Paragraph 1 of the Key Employment Agreement, relating to Property Rights, states as follows:

> All data … and relationships with customers and prospective customers relating in any way to the present and/or contemplated products, services or business of the Employer[2] (collectively "Developments") that I may conceive, make, invent or suggest during or as a result of my employment by the Employer … shall be the sole and absolute property of the Employer free of any rights of any kind on my part….I agree to do all acts and things … deemed by the Employer to be necessary or desirable at any time in order to effect the full assignment of the Employer of my rights, if any, to such Developments. (Exh. D-6, ¶ 1).

4.      Paragraph 2 of the Key Employment Agreement prohibits the direct or indirect use, publication, communication, description, dissemination or disclosure of "Confidential Information" without Medco's consent (Exh. D-6, ¶ 2). "Confidential Information" is defined to include "customer lists" and "lists of potential customers" (Exh. D-6, ¶ 2).

5.      Paragraph 3 of the Key Employment Agreement states as follows:

> Upon the termination of my employment with the Employer … I shall immediately deliver to the Employer all plans, designs, drawings, specifications, listings, manuals, records, notebooks, computer memory, disks or programs, and similar repositories of or containing Confidential Information or other data relating to the Employer's products, services, or business then in my possession or control…." (Exh. D-6, ¶ 3).

---

D-39, D-43 through D-45, D-48 through D-51, D-54 through D-61, D-65, and AM – EMAILS 0982, referenced herein, are attached to the Bennett Cert. as Exhibit C.
[2] The Key Employee Agreement defines "Employer" to include Defendant Medco.

6.      In late 2004, Plaintiff's title became a Senior Director (Meyers Dep. Tr., 48). This was not a promotion, as neither Plaintiff's job duties nor her compensation changed as a result of this change in title (Meyers Dep. Tr., 48, 54). A Senior Director at Medco is at the same grade level as a Director and receives the same pay and benefits (Transcript of Deposition of Tara Wolckenhauer ("Wolckenhauer Dep. Tr."), 125-126).[3]   The Senior Director title generally is awarded on the basis of length of employment with Medco (Wolckenhauer Dep. Tr., 125-126).

7.      After the 2004 performance year, Plaintiff's performance was evaluated by her manager, Mr. Kornwasser (Meyers Dep. Tr., 47-48; Exh. D-7). In the written performance review, Mr. Kornwasser commended Plaintiff's "excellent job coming up to speed on the ins and outs of Medco", and for gaining the respect of her team (Exh. D-7). This written performance review also stated as follows:

> Amy needs to spend more time on the details. For 2005 Amy will
> need to polish up on her presentation skills, increase confidence
> and gain the credibility of Medco colleagues outside of Product &
> Business Development. (Exh. D-7).

8.      After the 2005 performance year, Plaintiff received a 3.02% merit salary increase ($4,900.00); a bonus in the amount of $20,000.00 (12.35% of her base salary); 720 stock option grants; and 280 restricted stock unit grants (Meyers Dep. Tr., 57; Exh. D-11).

9.      By mid-2006, Mr. Kornwasser had determined that Plaintiff was ineffective in her role in his group (Transcript of Deposition of Laizer Kornwasser ("Kornwasser Dep. Tr."), 37-38).[4]   He realized the Business Development role did not maximize Plaintiff's strengths which,

---

[3] A true and correct copy of the portions of the Wolckenhauer Dep. Tr. cited herein is attached to the Bennett Cert. as Exhibit D. True and correct copies of the exhibits marked at Ms. Wolckenhauer's deposition as Exhs. P-4 and P-15 are attached to the Bennett Cert., as Exhibit E.

[4] A true and correct copy of the portions of the Kornwasser Dep. Tr. cited herein is attached to the Bennett Cert. as Exhibit F.

due to her consulting background, were strategy-related tasks, thinking through strategy-related issues and understanding data (Kornwasser Dep. Tr., 38, 40-41).   Plaintiff was ineffective at executing deals without extensive guidance or structure, coming up with structures around deals and presenting to executives (Kornwasser Dep. Tr., 38-40; Transcript of Deposition of Tricia McDermott ("McDermott Dep. Tr."), 13).[5]   Mr. Kornwasser also felt Plaintiff needed a better grasp of details, especially with regard to financial data (Kornwasser Dep. Tr., 40).

10.     Mr. Kornwasser and Plaintiff discussed the fact that Plaintiff's strengths did not match the needs of Mr. Kornwasser's Business Development Group (Kornwasser Dep. Tr., 44).

11.     Plaintiff received a negative performance evaluation from Mr. Kornwasser in 2006 (Kornwasser Dep. Tr., 43; Exh. P-21).   Mr. Kornwasser awarded Plaintiff a "contributor" rating, which was lower than the "fully performing" rating he awarded Plaintiff in 2005 (Kornwasser Dep. Tr., 57-58).

12.     Notwithstanding this negative performance review, Plaintiff and Mr. Kornwasser had a good relationship, and Plaintiff considered Mr. Kornwasser to be a "mentor" (Meyers Dep. Tr., 295; Kornwasser Dep. Tr., 64).   Plaintiff continued to come to Mr. Kornwasser for advice and coaching even after Plaintiff was moved out of his group (Kornwasser Dep. Tr., 64).

13.     After the 2006 performance year, Plaintiff received a 3.00% salary increase ($5,000.00); an $18,000.00 bonus (10.79% of her base salary); 505 stock option grants; and 175 restricted stock unit grants (Meyers Dep. Tr., 61-62; Exh. D-13).

---

[5] A true and correct copy of the portions of the McDermott Dep. Tr. cited herein is attached to the Bennett Cert. as Exhibit G.

14.     After Mr. Kornwasser was promoted, Plaintiff began reporting to Tom Moriarity (Transcript of Deposition of Dr. Glen Stettin ("Stettin Dep. Tr."), 69-70).[6]  Mr. Moriarity also had issues with Plaintiff's performance in his group (Transcript of Deposition of Dr. Inderpal Bhandari ("Bhandari Dep. Tr."), 68).[7]

15.     At some point prior to February 2007, Mr. Moriarity asked Dr. Stettin if he could look for a position for Plaintiff in Dr. Stettin's group because there did not seem to be a long-term opportunity for Plaintiff in Mr. Moriarity's group (Stettin Dep. Tr., 66).  Mr. Moriarity also told Dr. Stettin that Mr. Moriarty's manager, John Driscoll, had disagreements with Plaintiff about her contributions to the group, especially her ability to execute (Stettin Dep. Tr., 67).

16.     In about February 2007, Plaintiff was moved to Medco's Knowledge Solutions group (Meyers Dep. Tr., 54; McDermott Dep. Tr., 12-13; Stettin Dep. Tr., 68).  In this role, Plaintiff reported to Dr. Inderpal Bhandari, Medco's Vice President of Knowledge Solutions and chief data officer.

17.     Dr. Bhandari had only joined Medco on about December 15, 2006 (Bhandari Dep. Tr., 5).  He reported to Dr. Glen Stettin, then Senior Vice President and General Manager of Advanced Clinical Solutions at Medco (Stettin Dep. Tr., 7-8).

18.     The members of Dr. Stettin's group were experts on RationalIQ, a product that provides insights to Medco's clients based on data on pharmacy and medical claims (Bhandari Dep. Tr., 21; Stettin Dep. Tr., 23).  RationalIQ was marketed mostly to prescription benefit plans, health insurers and medical plan sponsors (Stettin Dep. Tr., 21).

---

[6] A true and correct copy of the portions of the Stettin Dep. Tr. cited herein is attached to the Bennett Cert. as Exhibit H.  A true and correct copy of the exhibit marked at Mr. Stettin's deposition as Exhibit P-18 is attached to the Bennett Cert. as Exhibit I.

[7] A true and correct copy of the portions of the Bhandari Dep. Tr. cited herein is attached to the Bennett Cert. as Exhibit J.

19.     Dr. Bhandari was hired in part to replace Scott Stratton, also a Vice President, and to develop Medco's RationalIQ product into a business (Bhandari Dep. Tr., 7, 29-30; Stettin Dep. Tr., 19).  While Mr. Stratton was knowledgeable and skilled in analysis and the capabilities of RationalIQ, he was not as effective as a business person or product manager and was unable to bring RationalIQ to market (Bhandari Dep. Tr., 15, 18, 23-24; Stettin Dep. Tr., 19-20).

20.     After Dr. Bhandari joined Medco, Mr. Stratton began to report directly to Dr. Bhandari, even though both were in Vice President positions (Bhandari Dep. Tr., 8).   Dr. Bhandari took away most of the people Mr. Stratton managed because he was not an effective manager (Bhandari Dep. Tr., 33).   Mr. Stratton then focused more on the development of RationalIQ rather than managing the business (Stettin Dep. Tr., 24).

21.     The decision to take Plaintiff into Dr. Bhandari's group was made both by Dr. Bhandari and Dr. Stettin (Bhandari Dep. Tr., 37; Stettin Dep. Tr., 66).

22.     Notwithstanding Plaintiff's issues working with Messrs. Kornwasser, Moriarity, and Driscoll, Dr. Stettin knew from previously working with Plaintiff that she was bright and dedicated, and "that it would be good to give her a chance" (Stettin Dep. Tr., 67-68).  Dr. Stettin also thought he could coach Plaintiff on her poor execution in project management skills (Stettin Dep. Tr., 68).  Messrs. Moriarity and Kornwasser agreed with Dr. Stettin's "inclination … to give [Plaintiff] another chance.…" (Stettin Dep. Tr., 70-71).

23.     Though Plaintiff had performance issues in her previous role under Messrs. Kornwasser, Moriarity, and Driscoll, Dr. Bhandari understood Plaintiff might have been a good fit for his group even though she was not a good fit for another group (Bhandari Dep. Tr., 68). Dr. Bhandari also had an urgent need for help in his group in connection with RationalIQ, and thought Plaintiff would be a good fit (Bhandari Dep. Tr., 36, 38; Stettin Dep. Tr., 72).

24.     Dr. Bhandari had several conversations with Plaintiff prior to Plaintiff's transfer into his group (Bhandari Dep. Tr., 39).   From these conversations, Dr. Bhandari was able to ascertain Plaintiff's strengths and capabilities (Bhandari Dep. Tr., 39).   He was impressed with Plaintiff's intelligence and perceived her to be a hard worker (Bhandari Dep. Tr., 43-45).

25.     Because of her demonstrated skills, Plaintiff was brought to Dr. Bhandari's group to be a project manager for RationalIQ, with the hope she would succeed in this role (Bhandari Dep. Tr., 27-28, 223; Stettin Dep. Tr., 20-21).

26.     The job duties Plaintiff assumed upon moving to Knowledge Solutions previously were performed by Mr. Stratton (Meyers Dep. Tr., 249; Bhandari Dep. Tr., 29-30).   Plaintiff's specific role was to come up with strategy for selling RationalIQ and bringing it to market (Stettin Dep. Tr., 34; Bhandari Dep. Tr., 45).

27.     After moving to Knowledge Solutions, Plaintiff's title became Senior Director, Knowledge Solutions (Meyers Dep. Tr., 55; Exh. D-10).   While there was not a job description for this position at the time, this was not unusual, since there are positions at Medco which do not have job descriptions (McDermott Dep. Tr., 85, 89).

28.     Plaintiff prepared a job description for Dr. Bhandari's approval (Meyers Dep. Tr., 55-56).   Dr. Bhandari approved this job description (Meyers Dep. Tr., 65-67; Exhs. D-10 and D-15).

29.     While working in Dr. Bhandari's group, Plaintiff worked from her New York City home on Fridays (Meyers Dep. Tr., 37, 194).

30.     While Plaintiff did well on strategy-related tasks while working in Dr. Bhandari's group, those tasks were completed prior to October 2007 (Bhandari Dep. Tr., 52, 92).   Plaintiff's

attempts to take RationalIQ to market were failing, however, and Plaintiff needed daily coaching (Bhandari Dep. Tr., 92-93).

31.     Prior to October 17, 2007, Dr. Bhandari provided Plaintiff with coaching and feedback in connection with a dispute with a colleague, Sharon McCoy, a salesperson in Medco's Healthcare Group (Meyers Dep. Tr., 94-95).  Ms. McCoy complained to Dr. Bhandari about her disappointment with Plaintiff's performance at sales presentations to two Medco customers, AmeriGroup and Bluegrass (Meyers Dep. Tr., 94-95; Bhandari Dep. Tr., 116-117). Ms. McCoy felt Plaintiff did not accurately represent the RationalIQ product to these customers (Meyers Dep. Tr., 97).  Plaintiff also disagreed with Ms. McCoy over RationalIQ's capabilities (Meyers Dep. Tr., 98-100).  As a result, Ms. McCoy told Dr. Bhandari that going forward, she did not want Plaintiff to present on any of her customer accounts (Bhandari Dep. Tr., 118).

32.     Rich Gerber, a Medco Vice President, also gave Dr. Bhandari negative feedback on Plaintiff's presentations to AmeriGroup and Bluegrass (Bhandari Dep. Tr., 120-121).

33.     While working in Dr. Bhandari's group, Plaintiff erroneously rated AmeriGroup, HealthNow, CBEBT, Calpers and NPDC AON highly as potential customers for the RationalIQ product although they were not, thereby causing Medco unnecessarily to waste resources (Bhandari Dep. Tr., 124, 127, 145, 148-153).

34.     Plaintiff testified that on some unspecified date in October 2007, she spoke to Ms. Wolckenhauer about the process for midyear performance reviews, which Plaintiff was scheduled to have with Dr. Bhandari on October 17, 2007 (Meyers Dep. Tr., 380-387; Exh. D-65).  Plaintiff's testimony and her notes of that alleged October 2007 conversation with Ms. Wolckenhauer also state that "it was a conversation about performance and career development, the first part of it was how do I get included in whatever talent management processes are going

on at Medco, so I do not recall the specifics of that conversation." (Meyers Dep. Tr., 387; Exh. D-65).

35.     Plaintiff came to Ms. Wolckenhauer seeking guidance on understanding how to work with Dr. Bhandari (Wolckenhauer Dep. Tr., 140, 144).  She complained that Dr. Bhandari spoke over Plaintiff and/or cut her off at meetings, and that he excluded her from meetings to which she believes she should have been invited (Meyers Dep. Tr., 159, 165-174, 179-181).

36.     Although Plaintiff kept highly detailed notes of her interactions with Medco's Human Resources department and Dr. Stettin, nothing in those notes indicate Plaintiff ever complained of disparate treatment because of her gender (Meyers Dep. Tr., 152-153; Exh. D-65).

37.     Plaintiff testified that in her alleged conversation with Ms. Wolckenhauer, she "may have hinted at concerns … that Inderpal was treating me differently from other senior people on his staff", but could not say whether she told Ms. Wolckenhauer that her stated concerns were gender-related.  (Meyers Dep. Tr., 387-390).

38.     Plaintiff did not raise concerns of gender-based discrimination during her conversation with Ms. Wolckenhauer (Wolckenhauer Dep. Tr., 98-99, 129-132).   Ms. Wolckenhauer testified:

> Q:     When you had these discussions with Ms. Meyers and she raised these issues, did she say that she thought that she was being treated worse than the other people in these respects?
>
> A:     No.
>
> \*       \*       \*
>
> Q:     Did [Plaintiff] say to you, when she said that she has an issue with the way that he speaks to her, did she say that she believes he speaks to other people who report to him differently than he speaks to her?
>
> A:     No.

9

Q:    Did she indicate that in some other way?

A:    No.

Q:    Did you believe that that's what she was saying?

A:    No.

Q:    So what did you think she was saying, what did you think she meant when she said that she had an issue with the way he spoke to her and that he as curt, abrupt and cut her off; what did you understand she meant?

A:    Amy wanted to know how to work better with her manager. It was about Amy, it wasn't about anyone else.

\*      \*      \*

Q:    Do you remember whether you or she referenced that as being an issue related to gender?

A:    No. (Wolckenhauer Dep. Tr., 130-132).

39.    Plaintiff recalls only one meeting, in the summer or fall of 2007, to which Plaintiff was not invited (Meyers Dep. Tr., 179).  When Plaintiff asked Dr. Bhandari about the meeting, Dr. Bhandari advised Plaintiff that he took care of it (Meyers Dep. Tr., 179).

40.    Ms. McDermott, a Human Resources Director, recalls only a single conversation with Plaintiff prior to October 17, 2007 (McDermott Dep. Tr., 42-43).  During this conversation, Plaintiff complained about Dr. Bhandari's management style, specifically in that he was abrupt and not clear with his directions to her (McDermott Dep. Tr., 42-43, 54, 65, 67).  She did not complain about gender discrimination (McDermott Dep. Tr., 42-43, 54, 65, 67).

41.    Plaintiff has no knowledge of how Dr. Bhandari interacted with other female Medco employees (Meyers Dep. Tr., 185).

42.    Plaintiff admits that Dr. Bhandari may have cut off or spoken over her male colleagues at meetings, including Mr. Stratton, DeWitt Revlon and Rocco Lulic (Meyers Dep. Tr., 178).

43.     Mr. Stratton also complained about Dr. Bhandari's abrupt manner (McDermott Dep. Tr., 66).

44.     On October 17, 2007, Plaintiff attended her previously-scheduled mid-year review with Dr. Bhandari (Meyers Dep. Tr., 89; Exh. D-24).  Dr. Bhandari provided Plaintiff with both positive and negative feedback on her job performance in his group (Meyers Dep. Tr., 113-117, 126-127).  He commended Plaintiff on her strategy but indicated that Plaintiff could not get sales, was not good in front of other people and did not understand the business model employed by Dr. Bhandari (Meyers Dep. Tr., 185-186, 417; Exh. D-65).

45.     Dr. Bhandari previously had given a similar appraisal of Plaintiff's strengths and weaknesses to Dr. Stettin (Stettin Dep. Tr., 63-64).  Dr. Bhandari told Dr. Stettin that Plaintiff had been contributing as far as strategy, but not from the standpoint of execution and relationships with people in Medco's marketing groups (Stettin Dep. Tr., 63-64).

46.     Dr. Bhandari's appraisal that Plaintiff was a good strategist also was consistent with the feedback Ms. Wolckenhauer received (Wolckenhauer Dep. Tr., 104-105).

47.     At the conclusion of the mid-year review on October 17, 2007, Dr. Bhandari stated that Knowledge Solutions may not be the best fit for Plaintiff, and that both he and Plaintiff should explore opportunities in other groups at Medco (Meyers Dep. Tr., 121, 130-131; Bhandari Dep. Tr., 185).  At the time, all strategic tasks in Dr. Bhandari's group had been completed (Bhandari Dep. Tr., 52, 92).

48.     Dr. Bhandari did not know about Plaintiff's alleged complaints to Human Resources before Plaintiff's October 17, 2007 mid-year review (Meyers Dep. Tr., 157).

49.     At 11:30 AM on October 19, 2007, Dr. Bhandari emailed Plaintiff that he had requested time with Lisa Ketner about potential roles Plaintiff could play for Ms. Ketner (Meyers

11

Dep. Tr., 132; Exh. D-26). At the time, Ms. Ketner was in Medco's Member Engagement group, working under Mr. Kornwasser (Meyers Dep. Tr., 141; Exh. D-26). Dr. Bhandari believed Plaintiff's strength in strategy made her a good fit for the Member Engagement group (Bhandari Dep. Tr., 190).

50.     At 4:15 PM on October 19, 2007, Plaintiff emailed Dr. Bhandari about whether he had spoken to Ms. Ketner (Meyers Dep. Tr., 133; Exh. D-26). Dr. Bhandari responded only three (3) minutes later that Ms. Ketner would get back to him in one-to-two days, after she spoke to her manager, Mr. Kornwasser (Meyers Dep. Tr., 133; Exh. D-26). Mr. Kornwasser in fact spoke to Ms. Ketner, who advised that there were no positions available in her group (Kornwasser Dep. Tr., 19).

51.     Plaintiff had further conversations about her role from October 19 through October 24, 2007 (Meyers Dep. Tr., 137).

52.     On October 24, 2007, Dr. Bhandari emailed Plaintiff about having spoken to Ms. Ketner (Meyers Dep. Tr., 142; Exh. D-29). Plaintiff subsequently spoke directly to Ms. Ketner, who indicated there were no opportunities in her group (Meyers Dep. Tr., 139-140, 461).

53.     In his October 24, 2007 email, Dr. Bhandari also stated that he had mentioned to Dr. Stettin the Plaintiff's interest in working for strategy in Dr. Stettin's group "as a whole" (Meyers Dep. Tr., 142; Exh. D-29). Dr. Bhandari encouraged Plaintiff to reach out to Dr. Stettin directly (Meyers Dep. Tr., 142; Exh. D-29).

54.     At a meeting with Plaintiff on Thursday, October 25, 2007, Dr. Bhandari told Plaintiff there were no positions for her in his group or in Mr. Kornwasser's group (Meyers Dep. Tr., 190-191, 193; Bhandari Dep. Tr., 109; Kornwasser Dep. Tr., 9-10).

55.     While working from home on Friday, October 26, 2007, Plaintiff called Dr. Stettin about her meeting with Dr. Bhandari the previous day, including the fact there was not a position for her in Mr. Bhandari's group (Meyers Dep. Tr., 194).  Dr. Stettin responded to Plaintiff that he would speak to Medco's Human Resources group and work on finding Plaintiff a position (Meyers Dep. Tr., 195-196).  Dr. Stettin immediately began looking for other positions for Plaintiff (Stettin Dep. Tr., 126).

56.     At this time, Dr. Stettin did not know about Plaintiff's alleged complaints to Human Resources (Stettin Dep. Tr., 121-122).

57.     On October 26, 2007, Lucille Accetta, Senior Director, Care Enhancing Solutions, needed assistance in her group (Transcript of Deposition of Lucille Accetta ("Accetta Dep. Tr."), 51-52).[8]

58.     Ms. Accetta was the owner of Medco's Rational Med and Optimal Health products, and was responsible for marketing these products (Accetta Dep. Tr., 7-8).  Rational Med is a product that alerts physicians about drug interactions (Accetta Dep. Tr., 11-12). Optimal Health is a care and support program that offers coaching by nurses and pharmacists to patients with certain conditions (Accetta Dep. Tr., 12).

59.     Dr. Stettin brokered the transition of Plaintiff to Ms. Accetta's group:

> Q:     What is your recollection of how Ms. Meyers ended up in your group?
>
> A:     I received a phone call from Glen Steton [*sic*] requesting if I need – he knew I needed additional help with all of the enhancements that we were being asked to incorporate into these products, and mentioned would I have the opportunity to work with Amy, having her on the team, and I accepted and said yes. (Accetta Dep. Tr., 5, 37).

---

[8] A true and correct copy of the portions of the Accetta Dep. Tr. cited herein is attached to the Bennett Cert. as Exhibit K.

60.     Dr. Stettin also spoke to Ms. Accetta's supervisor, Christopher Bradbury, about moving Plaintiff into Ms. Accetta's group (Transcript of Deposition of Christopher Bradbury ("Bradbury Dep. Tr."), 18-19).[9]  At the time, Mr. Bradbury was Medco's Vice President of Care Enhancing Solutions (Meyers Dep. Tr., 218; Bradbury Dep. Tr., 5).  He reported to Dr. Stettin at all times relevant to this motion (Bradbury Dep. Tr., 6).

61.     While there was not an open position in Ms. Accetta's group at the time, Mr. Bradbury expressed interest in having Plaintiff join the group: "We had significant needs to help further grow the care enhancing solutions business, and I also had past interactions with Amy and viewed her very favorably" (Bradbury Dep. Tr., 22-24).   Mr. Bradbury also thought Plaintiff's skill set, with which Mr. Bradbury was familiar from past interactions, aligned with his group's need for a strategist (Bradbury Dep. Tr., 27; Wolckenhauer Dep. Tr., 70).

62.     Later in the afternoon on October 26, 2007, Dr. Stettin instructed Plaintiff to report to Ms. Accetta on the following Monday, October 29, 2007 (Meyers Dep. Tr., 196-197).

63.     Plaintiff began reporting to Ms. Accetta on October 29, 2007 (Meyers Dep. Tr., 218).  In this role, Plaintiff performed work for both Ms. Accetta and Mr. Bradbury (Meyers Dep. Tr., 218).

64.     Plaintiff's move to Ms. Accetta's group was not a demotion (Stettin Dep. Tr., 138-139; Wolckenhauer Dep. Tr., 125-126).  Ms. Accetta was the head of her own group and had many more responsibilities than Plaintiff despite sharing the same title as Plaintiff (Accetta Dep. Tr., 5, 7, 10).

---

[9] A true and correct copy of the portions of the Bradbury Dep. Tr. cited herein is attached to the Bennett Cert. as Exhibit L.

65.     While Plaintiff was working in Ms. Accetta's group, several individuals in Dr. Stettin's group reported to individuals with the same title (Stettin Dep. Tr., 140; Exh. P-4).  In particular, as of September 2008:

      a.     Two Vice Presidents – Rich Feifer, M.D. and Rich Gerber – reported directly to Mr. Bradbury;

      b.     Three Vice Presidents reported directly to Mr. Gerber, and indirectly to Mr. Bradbury;

      c.     Mr. Stratton reported directly to Mr. Bhandari;

      d.     One Vice President reported directly to Vice President Michel Dufresne; and

      e.     One Senior Manager – Mike Larkin – reported directly to another Senior Manager, Jeff Gould (Exh. P-4).

66.     On October 29, 2007, Plaintiff emailed Dr. Stettin and Ms. McDermott that she was looking forward to working with Ms. Accetta (Meyers Dep. Tr., 201; Exh. D-34).  Plaintiff never raised any concerns that she was being demoted (Accetta Dep. Tr., 49-50).

67.     In this same October 29, 2007 email, Plaintiff wrote that Mr. Bhandari had told her that going forward, Mr. Bhandari's group's needs would be different and would not suit her strengths (Exh. D-34).

68.     There was an extensive list of projects for Plaintiff in Ms. Accetta's group (Accetta Dep. Tr., 37-39).  Upon Plaintiff's arrival in the group on October 29, 2007, Plaintiff and Ms. Accetta met and launched a project plan to get Plaintiff started on some of these projects (Accetta Dep. Tr., 42).  At the time Plaintiff moved to Ms. Accetta's group, Ms. Accetta believed the projects assigned to Plaintiff would last for more than one year (Accetta Dep. Tr., 65).

69.     At their October 29, 2007 meeting, Plaintiff told Ms. Accetta that "she was very good at strategy and at financial modeling" (Accetta Dep. Tr., 45-46, 67).   From working with Ms. Accetta, Ms. Accetta learned Plaintiff's "skill-sets were challenged in the area[s] of product management, execution of getting down to the detail of getting something launched" (Accetta Dep. Tr., 47).   Plaintiff also struggled with task-oriented functions and timely completion of projects (Accetta Dep. Tr., 67).

70.     As was the case when Plaintiff moved into Dr. Bhandari's group, there was no existing job title for Plaintiff's position in Ms. Accetta's group (Accetta Dep. Tr., 52).   On November 20, 2007, Plaintiff suggested to Ms. Accetta that Plaintiff's title should be "Senior Director, Strategy and Market Development, Care Enhancement Solutions" (Meyers Dep. Tr., 216; Exh. D-39).   Ms. Accetta agreed to this title, which was not materially different from Plaintiff's title in Dr. Bhandari's group (Meyers Dep. Tr., 216; Accetta Dep. Tr., 52; Exh. D-39). Rather, it merely reflected that Plaintiff had changed groups (Accetta Dep. Tr., 82-83).

71.     It was not out of the ordinary for an employee in Dr. Stettin's organization to decide his or her title with the input of their manager (Stettin Dep. Tr., 163).

72.     At some point after Plaintiff moved out of Dr. Bhandari's group, Dr. Stettin made a business decision to deemphasize RationalIQ, and to make it part of Rational Med rather than a stand-alone product (Stettin Dep. Tr., 24-25, 30; Accetta Dep. Tr., 13).   Dr. Stettin made this decision on the basis of recommendations by Mr. Bradbury and Dr. Bhandari (Stettin Dep. Tr., 27).

73.     In late 2007 or early 2008, Plaintiff prepared written objectives for 2008 (Meyers Dep. Tr., 233; Exh. D-45).   These written objectives were based on an email from Mr. Bradbury

outlining Plaintiff's projects for the year (Meyers Dep. Tr., 233; Exh. D-45).  There are fifteen objectives identified in this document (Exh. D-45).

74.    Desk/office sharing and asking employees to work from home were common practices at Medco, and were necessitated by lack of physical office space, not cost (Stettin Dep. Tr., 121; Wolckenhauer Dep. Tr., 233).  Plaintiff volunteered to share an office and work from home two days per week:

> Q:    Now is it true when Ms. Meyers joined your group she began sharing a desk with somebody?
>
> A:    We were asked as a corporate company to volunteer if we were willing to work from home, and she [Plaintiff] volunteered.
>
> Q:    No, I was asking about the desk sharing[.]
>
> A:    The desk sharing is based upon volunteering to work from home.  So you work from home two days a week, and the other person works from home three days a week, so you share an office.
>
> Q:    OK, so it's your testimony that Ms. Meyers asked to be part of that program?
>
> A:    Yes.  (Accetta Dep. Tr., 53; Exh. P-18)

75.    Though Plaintiff volunteered to work from home, her female coworker, Lauren Bodner, did not (Exh. P-18).

76.    In 2008, Ms. Accetta prepared and conducted Plaintiff's year-end performance review for 2007 (Meyers Dep. Tr., 228-229; Exh. D-43).  Plaintiff met with Ms. Accetta to review and discuss the 2007 performance review on about March 31, 2008 (Meyers Dep. Tr., 229; Exh. D-43).

77.    At this performance review, Ms. Accetta told Plaintiff the comments she had received about Plaintiff were positive overall (Meyers Dep. Tr., 230).

78.     There is no negative feedback from Dr. Bhandari on Plaintiff's 2007 performance review (Meyers Dep. Tr., 230, 232; Exh. D-43).   While Ms. Accetta spoke to Dr. Bhandari in connection with Plaintiff's 2007 performance review, his participation was limited, and Ms. Accetta included only Dr. Bhandari's positive feedback on Plaintiff's performance in his group (Meyers Dep. Tr., 86, 91; Accetta Dep. Tr., 100).   The 2007 performance review did not take into account any issues Plaintiff may have had with Dr. Bhandari (Stettin Dep. Tr., 167).

79.     On her 2007 performance review, Ms. Accetta commented extensively on Plaintiff's ability to strategize, noting, for example, that "Amy [] displays exceptional abilities to develop strategy" (Accetta Dep. Tr., 102; Exh. D-43).

80.     Dr. Stettin did not participate in Plaintiff's 2007 performance review, but approved her rating and bonus, as recommended by Ms. Accetta (Stettin Dep. Tr., 166-169).

81.     Ms. Accetta awarded Plaintiff an overall rating of "Meets Expectations" on her 2007 performance review (Meyers Dep. Tr., 231; Accetta Dep. Tr., 92).   As a result, Plaintiff received a 3.03% merit increase to her salary ($5,200.00); a $40,000.00 bonus (23.27% of her base salary); 1140 stock option grants; and 360 restricted stock unit grants (Meyers Dep. Tr., 232; Exh. D-44).   Plaintiff's 2008 salary was $177,100.00 (Meyers Dep. Tr., 298).   Her bonus for this year was in the upper end of the range for employees with "Meets Expectations" ratings (Stettin Dep. Tr., 167).

82.     As of May 29, 2008, Plaintiff admittedly was fully-utilized, and was working on nine projects for Mr. Bradbury alone (Meyers Dep. Tr., 238-239; Exh. D-48).   Because these projects were tactical in nature, they required extensive work (Meyers Dep. Tr., 239).

83.     While working in Ms. Accetta's group in 2008, Plaintiff was a witness in litigation between Medco and a former customer, IMS Health (Meyers Dep. Tr., 240).   Plaintiff

spent an estimated 10% to 60% of her time on the IMS litigation through about September 2008 (Meyers Dep. Tr., 240).

84.    Plaintiff was deposed in connection with the IMS litigation on August 1, 2008 (Meyers Dep. Tr., 241; Exh. D-49).  She also testified at an arbitration of the matter on August 23, 2008 (Meyers Dep. Tr., 243).  She was not involved in the IMS litigation after that date, and believes the IMS litigation ended in September 2008 (Meyers Dep. Tr., 243, 254; Exh. D-50).

85.    Dr. Stettin did not know of the IMS litigation in October 2007 (Stettin Dep. Tr., 132-133).

86.    Ms. Accetta was not aware of the IMS litigation until Plaintiff told her she would be out of the office in connection with the litigation (Accetta Dep. Tr., 53-54).  Ms. Accetta further testified as follows regarding the IMS litigation:

> Q:    Other than the conversation with Ms. Meyers about it, did you have any conversations with anyone else at Medco about that lawsuit.
>
> A:    No.
>
> Q:    Or about Ms. Meyers' role in that lawsuit?
>
> A:    No.
>
> Q:    Do you know anything about that lawsuit?
>
> A:    Absolutely not.
>
> Q:    Do you know how it was resolved?
>
> A:    No.  (Accetta Dep. Tr., 54).

87.    In about the third quarter of 2008, Plaintiff received a mid-year performance review from Ms. Accetta (Meyers Dep. Tr., 244).  Ms. Accetta told Plaintiff that most of the feedback on her performance was positive (Meyers Dep. Tr., 245).  While Ms. Accetta recognized at this performance review that there was little strategic work for Plaintiff to perform,

Plaintiff had approximately twelve projects assigned to her at the time (Meyers Dep. Tr., 244-245, 247; Exh. D-51).

88.     During her weekly one-on-one conversations with Ms. Accetta, Plaintiff told Ms. Accetta that the role Ms. Accetta needed help with was more of a project manager role than one that required Plaintiff's skill set, and that Ms. Accetta could have two project managers for the salary Plaintiff had been receiving (Accetta Dep. Tr., 66-67, 126).  Plaintiff asked Ms. Accetta to place her on a downsizing list (Accetta Dep. Tr., 77).

89.     By the end of 2008, the majority of projects on which Plaintiff had worked had been completed or de-prioritized (Accetta Dep. Tr., 63).  The remaining projects could have been absorbed by others in the group (Bradbury Dep. Tr., 111-112).

90.     In about December 2008, Dr. Stettin communicated to Mr. Bradbury that Mr. Bradbury's team was over budget and needed to cut costs (Stettin Dep. Tr., 173).  In response, Mr. Bradbury and Ms. Accetta recommended eliminating the positions of Plaintiff and another employee in the group who had volunteered to be laid off in order to meet budget (Stettin Dep. Tr., 173, 176-178).

91.     In December 2008, Mr. Bradbury informed Ms. Accetta that Plaintiff's position would be eliminated because Dr. Stettin's organization needed to reduce costs and was downsizing (Accetta Dep. Tr., 70-71; Bradbury Dep. Tr., 107, 125).

92.     Plaintiff's performance was not a factor in the decision to eliminate her position (Meyers Dep. Tr., 267; Bradbury Dep. Tr., 112).  Indeed, Plaintiff was a valuable contributor to Ms. Accetta's team in 2008 (Stettin Dep. Tr., 172).

93.     Dr. Bhandari was not consulted on and did not play a role in the decision to terminate Plaintiff's employment in about December 2008 (Bhandari Dep. Tr., 226-227).  Ms.

Wolckenhauer, who was out on maternity leave in December 2008, also was not involved in the decision to terminate Plaintiff employment (Wolckenhauer Dep. Tr., 244).

94.    Plaintiff had open projects at the time her position was eliminated (Meyers Dep. Tr., 269-270). These projects and Plaintiff's other tasks and responsibilities were absorbed by Ms. Accetta and others in the group (Accetta Dep. Tr., 66).

95.    After Plaintiff's position was eliminated on January 8, 2009, the only remaining members of Ms. Accetta's group were Ms. Accetta and Ms. Bodner (Accetta Dep. Tr., 19-20). Medco did not seek anyone to replace Plaintiff's position in Ms. Accetta's group (Accetta Dep. Tr., 118-119).

96.    Mr. Bradbury notified Plaintiff that her position was eliminated on Thursday, January 8, 2009 (Meyers Dep. Tr., 266). Plaintiff was presented with a termination letter and a standard form severance plan package (Meyers Dep. Tr., 267, 270-271; McDermott Dep. Tr., 95-96; Wolckenhauer Dep. Tr., 248-249; Exhs. D-54 and P-15[10]).

97.    The January 8, 2009 termination letter, which was prepared by Ms. Wolckenhauer, states as follows in relevant part:

> As was discussed with you, your position with Medco Health Solutions, Inc. is being eliminated effective as of the date of this letter.  You are eligible for certain pay and benefits under the Medco Health Solutions, Inc. Severance Plan.  Under the terms of the Plan, you will receive severance pay and benefits for a period of 20 weeks from January 9, 2009 to May 28, 2009 and outplacement benefits for 6 months. In addition, you will receive a discretionary bonus of $40,000.00 for performance year 2008.  All payments are subject to applicable withholding.  In order to receive severance pay and benefits under the Plan you must sign and return the enclosed Release of Claims.  Your severance payments will not commence until after the 7 day revocation period for the Release of Claims has expired and the Release of Claims has become effective.  **The bonus amount will be paid in a lump sum as**

---

[10] Exhibit P-15 is not a complete copy of the Medco severance plan package provided to Plaintiff, but is sufficiently complete for purposes of Medco's summary judgment motion.

> **soon as practicable following the effective date of the Release of Claims.** Your benefits coverage will continue during the review period.
>
> *          *          *
>
> Please review all documents carefully and ensure the Release of Claims is returned promptly. If your signed release is not returned to me within 45 days after the date you receive this letter, you will not receive severance pay or benefits and you will not be treated as separated. (Exh. D-54) (emphasis added).

98.     The bonus amount set forth in the January 8, 2009 termination letter was chosen pursuant to Medco's policy that severed employees would receive the same bonus as in the previous year, subject to the signing of a release of claims (Deposition of Edward T. Redling ("Redling Dep. Tr."), 48-49)[11].   The amount of the bonus was not determined based on Plaintiff's performance during 2008, nor on the basis of input from Plaintiff's managers (Redling Dep. Tr., 53, 57).

99.     The review period for the severance plan package was forty-five (45) days, or through February 22, 2009 (Meyers Dep. Tr., 283; Exh. P-15 at D-0046 and D-0051).

100.    On or about January 8, 2009, as part of the termination of Plaintiff's employment, Plaintiff was prevented from accessing her telephone contacts and computerized calendar on Medco's system, pursuant to Plaintiff's Key Employee Agreement (Meyers Dep. Tr., 273; Bradbury Dep. Tr., 128; Exh. D-6).

101.    At Plaintiff's request, Medco provided Plaintiff with a printed copy of portions of her calendar and certain personal phone numbers, including her physician's phone number, until Medco could determine which of Plaintiff's contacts should be withheld as "Confidential

---

[11] A true and correct copy of the portions on the Redling Dep. Tr. cited herein is attached to the Bennett Cert. as Exhibit M.

Information", pursuant to Plaintiff's Key Employment Agreement (Meyers Dep. Tr., 273-274; Exhs. D-6 and D-55).

102.   Later on January 8, 2009, Ms. McDermott directed Medco's IT department to release Plaintiff's contacts (Meyers Dep. Tr., 279-281; Exh. D-56).   Medco sent Plaintiff a CD containing said information on about March 12, 2009 (Meyers Dep. Tr., 282-283; Exh. D-57).

103.   In the afternoon of January 8, 2009, Plaintiff told Mr. Bradbury she understood the decision to eliminate her position because, in Plaintiff's opinion, Mr. Bradbury needed two grade-five positions rather than a Director (Bradbury Dep. Tr. 132).

104.   On about February 18, 2009, Plaintiff's attorney, David Marek, Esq., sent Medco's in-house counsel, John J. Shea, Esq., a proposed EEOC charge (Meyers Dep. Tr., 283-284; Exh. D-58).   In his letter of that date, Mr. Marek stated his intent to file this EEOC charge on February 23, 2009 (Exh. D-58).   This proposed EEOC charge in fact was filed and received by the EEOC on February 25, 2009 (Meyers Dep. Tr., 285; Exh. D-59).

105.   By the end of the 45-day review period for the severance plan package on February 22, 2009, Plaintiff had not agreed to the severance plan package nor signed the release of claims (Meyers Dep. Tr., 273).

106.   Plaintiff utilized the out-placement counselor for three out of the six months the service was available to her, even though she had not agreed to the severance plan package or signed the release of claims (Meyers Dep. Tr., 271).

107.   On March 6, 2009, Medco erroneously paid Plaintiff $21,756.96, the net after-tax amount of the $40,000.00 discretionary bonus identified in the termination letter (Meyers Dep. Tr., 289; Redling Dep. Tr., 96-97).

108.    At the direction of Kelly Webber, Medco's Vice President of Human Resources, on March 26, 2011, Ms. Wolckenhauer wrote Plaintiff to demand return of the erroneously-paid discretionary bonus (Meyers Dep. Tr., 285-286; Wolckenhauer Dep. Tr., 258; McDermott Dep. Tr., 7; Exh. D-60).

109.    Plaintiff refused to return the discretionary bonus and on about April 6, 2009, filed an amended charge of discrimination with the EEOC (Meyers Dep. Tr., 289-290; Exh. D-61).   Said amended charge alleges that Medco's demand for return of the erroneously-paid discretionary bonus was retaliatory (Exh. D-61).

110.    In about June 2009, Dr. Bhandari hired Elaine Koski to bring RationalIQ to market (Bhandari Dep. Tr., 50-51, 208).  Ms. Koski was hired as a Director and reported directly to Dr. Bhandari (Bhandari Dep. Tr., 50-51).  Previously, this role was handled by Mr. Stratton (Bhandari Dep. Tr., 51-52).

111.    Plaintiff filed her Complaint in this matter on November 5, 2009 (Bennett Cert., Exh. N).

112.    On January 27, 2010, Plaintiff sent an email to Mr. Gerber, with whom she worked during her employment with Medco, as follows:

> Hey, when you have time, I have a question for you…
>
> -early on in our [conversations] you mentioned that I was in the wrong job when working for Chris and Lucille.  I meant to ask you – what did you think would be a better fit?  Client stuff?  Deal stuff?  Different environment?  I think you saw certain things that I'm only just figuring out, and your perspective is really valuable (Meyers Dep. Tr., 454-455, 457; Exh. AM – EMAILS 0982).

113.    Mr. Gerber responded to this email that same day, as follows: "It seemed to me that you were doing tasks vs[.] running projects which I think would be a good fit for you…what do you think?" (Exh. AM – EMAILS 0982).

114.     Plaintiff responded as follows to Mr. Gerber's reply email:

> I think that is a good fit if its [*sic*] about leading people and
> involves something new, and if there's a tactical person to back me
> up…If I'm the one responsible for tracking progress or lots of
> operational detail, then I'm a disaster waiting to happen[.]  (Exh.
> AM – EMAILS 0982).

115.     Plaintiff admits that substance of her January 27, 2010 reply to Mr. Gerber is

identical to what Dr. Bhandari told her at her October 17, 2007 review:  "Did he tell me that?

Yes."  (Meyers Dep. Tr., 456).  It also is substantially identical to Mr. Kornwasser's appraisal of

Plaintiff's performance in his group in 2006 (Kornwasser Dep. Tr., 37-40).

116.     Plaintiff and Mr. Kornwasser spoke a "couple" of times per year after Plaintiff left

Medco (Kornwasser Dep. Tr., 69-70).  During these conversations, Plaintiff and Mr. Kornwasser

discussed Plaintiff's job searches (Kornwasser Dep. Tr., 70).  During one conversation, Plaintiff

asked Mr. Kornwasser if she could use Mr. Kornwasser as a job reference, to which Mr.

Kornwasser agreed (Kornwasser Dep. Tr., 70-71).

117.     Mr. Kornwasser knew Plaintiff had commenced a lawsuit against Medco, but saw

nothing wrong about communicating with Plaintiff during this litigation about her job search or

if Plaintiff wanted to use him as a reference (Meyers Dep. Tr., 296; Kornwasser Dep. Tr., 81,

87).

118.     On February 14, 2011, Mr. Kornwasser called Plaintiff to discuss an idea about a

potential consulting opportunity at Medco (Meyers Dep. Tr., 434; Kornwasser Dep. Tr., 77-79,

88-89).

119.     At the time Mr. Kornwasser made this call, there was not an available consulting

position (Kornwasser Dep. Tr., 79, 81).  Mr. Kornwasser testified as follows:

> Q:     What was the purpose of your calling Ms. Meyers on
>        February 14?

A:     As I mentioned earlier, I was always looking for opportunities for her and I thought I had an opportunity for her.

Q:     Where?

A:     To do consulting for Medco.

Q:     So you thought you had an opportunity at Medco for her?

A:     I thought I had an opportunity for her to consult at Medco.

Q:     Would that have been reporting to you?

A:     No.

Q:     Who would she have been reporting to?

A:     If the opportunity would have materialized and the Business Development people would have agreed to it, then she would have provided consulting to the Business Development Team. (Kornwasser Dep. Tr., 78-79).

Mr. Kornwasser further testified:

Q:     On February 14, when you had the call and the call ended, was Ms. Meyers still considered for this opportunity that you initially called her about?

[attorney objection]

A:     I called her about an idea. At that time there was no opportunity. If she was interested in the idea, I was going to see if there was an opportunity. (Kornwasser Dep. Tr., 88-89).

120.   Plaintiff's testimony confirms that Mr. Kornwasser did not call about an actual open position at Medco:

Q:     Who said what to whom in that second call?

A:     Laizer wanted to know how I was doing and he said I don't know where things are, but some of the contracts that you worked are coming due. Perhaps, there's an opportunity for you as a consultant.

Q:     Is that all he said before you spoke?

26

> A:  Then he actually directly asked.  He said I don't know where things are with Medco, but if there's a gap, maybe this would fill it.   And then I said, Laizer, we're in deposition and he said I have to go.  Or something like that. I said I'm in deposition, I can't talk to you; he said ok.  And we hung up the phone.  (Meyers Dep. Tr., 434-435).

121.   Plaintiff did not indicate to Mr. Kornwasser that she was interested in pursuing any potential opportunity (Kornwasser Dep. Tr., 81-82).

122.   Mr. Kornwasser did not speak to anyone at Medco prior to spontaneously calling Plaintiff (Kornwasser Dep. Tr., 78-79, 83-84).

123.   At the time Mr. Kornwasser made this call, he knew of Plaintiff's lawsuit against Medco but not its status (i.e., whether it still was ongoing) (Kornwasser Dep. Tr., 81).

Dated: Morristown, New Jersey
       May 11, 2011

Respectfully submitted,

JACKSON LEWIS LLP
Attorneys for Defendant


By:  /s/ John K. Bennett
     JOHN K. BENNETT

4850-9769-9337, v. 2