UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

AMY MEYERS,

                    Plaintiff,

          - against -

MEDCO HEALTH SOLUTIONS, INC.,

                    Defendant.

------------------------------------------------------------- x

09 CV 9216

**PLAINTIFF'S
STATEMENT PURSUANT
TO LOCAL CIVIL RULE 56.1**

        Plaintiff, Amy Meyers, by her attorneys, Liddle & Robinson, L.L.P., hereby submits her Statement Pursuant to Local Civil Rule 56.1 in opposition to the motion for summary judgment by Defendant, Medco Health Solutions, Inc. ("Medco" or "Defendant").

## 1. MATERIAL FACTS TO BE TRIED

### A.    Plaintiff Did Not Have Performance Issues Before She Joined Bhandari's Group

        1.      Plaintiff received a Bachelor of Science from the Massachusetts Institute of Technology in Cambridge, MA in June 1989. (Exhibit 23[1]).  She received her MBA from the Harvard Graduate School of Business in 1994.  (Exhibit 23).

        2.      Pursuant to the March 26, 2004 employment agreement, Plaintiff began working at Medco in the position of Director, Corporate Strategy and Business Development.  (Exhibit 24).  In this position, Plaintiff reported to Laizer Kornwasser, then Medco's Vice President of Business Development.  (Def. SOMF, ¶ 1[2]).

---

[1] All "Exhibits" referenced in this 56.1 Statement refer to the Exhibits attached to the Affirmation of David Marek submitted in connection with Plaintiff's Opposition to Defendant's Summary Judgment Motion (the "Motion").
[2] "SOMF" refers to Defendant's "Statement of Material Facts."

3.    In late 2004, Defendant promoted Plaintiff to the position of Senior Director. (Meyers Depo. Tr. at 48[3]). Mr. Kornwasser told Plaintiff at that time that he decided to promote her because of the quality of her work. (Meyers Aff., ¶ 1[4]).

4.    In mid-2006, Mr. Kornwasser was promoted to the position of Senior Vice President, Retail, Mail and Diabetes Markets and in this role is responsible for retail network and mail pharmacy strategy and margin. In this position, he oversees network pricing, negotiations, plan design and programs that maximize the retail and mail channels. In this position, Mr. Kornwasser is one of the 10 most senior people at all of Medco. (Exhibit 6, Kornwasser Depo. Tr. at 75).

5.    When Mr. Kornwasser was promoted, Plaintiff began reporting to Tom Moriarty, who became head of the Business Development Group. (Exhibit 6, Kornwasser Depo. Tr. at 36). (Meyers Aff., ¶ 4)

6.    Plaintiff submitted her 2006 Accomplishments to her managers, and Defendant has not offered any evidence that disputes this document. (Exhibit 27). As a result of Plaintiff's strong performance while she reported to him, Mr. Moriarty nominated Plaintiff for a "President's Award," pursuant to which Medco paid Plaintiff an additional bonus in or around May 2007. (Meyers Aff., ¶ 5).

**B.    When Bhandari Joined Medco, Rational IQ Was Not Successful Under Stratton's Management**

---

[3] Portions of Meyers deposition referenced herein can be found in the Exhibit B to the Certification of John K. Bennett, Esq., which was submitted with Defendant's Summary Judgment Motion.

[4] "Meyers Aff., ¶ _" refers to the Affidavit of Amy Meyers submitted in connection with Plaintiff's Opposition to Defendant's Summary Judgment Motion.

7.     In 2006, Inderpal Bhandari "was a consultant to Medco for a few months working with Glen [Stettin]." (Exhibit 4, Bhandari Depo. Tr. at 9-10).

8.     In or around December 2006, Dr. Stettin "made [Bhandari] an offer to join Medco. So, we pretty much had a shared understanding by that time as to what, you know, they needed me to do." (Exhibit 4 Bhandari Depo. Tr. at 9-10). When Dr. Stettin hired Mr. Bhandari to this position, Medco did not have a vacant position or a formal job posting. (Exhibit 4, Bhandari Depo. Tr. at 9-10).

9.     At the time Mr. Bhandari joined Medco on a full-time basis (December 2006), Scott Stratton was responsible for Rational IQ. According to Mr. Bhandari, "the Rational IQ product was being run by a gentleman called Scott Stratton. It was a very small group when I joined. I think – I forgot how many that it was maybe eight or nine people. And Scott was the leader of that group." (Exhibit 4, Bhandari Depo. Tr. at 7). Mr. Stratton "was running [Rational IQ]. And he was pretty much conducting the sales himself." (Exhibit 4, Bhandari Depo. Tr. at 23).

10.     In 2007, Rational IQ was not a large portion of Medco's business. Mr. Bhandari testified that Rational IQ generated "maybe, you know, I forget what it was, 1 or $2 million of revenue." (Exhibit 4, Bhandari Depo. Tr. at 55).   Plaintiff believed that Rational IQ had under $500,000 in revenues in 2007. (Meyers Aff., ¶13). According to Mr. Bhandari, Medco, on the other hand, "is a $60 billion company. … So in terms of the scale, this wasn't – I wouldn't say that this was a successful offering." (Exhibit 4, Bhandari Depo. Tr. at 55-56).

11.     Under Mr. Stratton's leadership, the Rational IQ product was not successful.  Mr. Bhandari said, "It is accurate to say that [Rational IQ] was unsuccessful [when he joined Medco]." (Exhibit 4, Bhandari Depo. Tr. at 24).

12.     Rational IQ was unsuccessful under Mr. Stratton's management because he was not an effective manager, and he "was not able to sell [the product]." (Exhibit 4, Bhandari Depo. Tr. at 24; 33).

13.     Mr. Bhandari "was given the responsibility of taking over that product and essentially figuring out a way to create some business value around it, because they had not been able to launch that product.  Stratton had been working it for a few years … prior to this, prior to [Bhandari] joining.  They could not – they had not been able to take it to market." (Exhibit 4, Bhandari Depo. Tr. at 18).

14.     Mr. Bhandari believed that the Rational IQ product "that was there [when he joined] had deficiencies, which led [him] to believe that it would be difficult for a client to make use of it directly." (Exhibit 4, Bhandari Depo. Tr. at 20-21).  Notwithstanding Mr. Stratton's inability to take Rational IQ to market, Mr. Bhandari did not remove Mr. Stratton from his (Bhandari's) group, where Mr. Stratton continues to work.  (Exhibit 4, Bhandari Depo. Tr. at 225).

15.     Accordingly, Medco "changed [Rational IQ] from a product offering to a service offering.  So the product itself would not be used directly by the customers, by our clients, to the extent possible, but would be used internally by our group who would then provide analyses to the clients in a consultative fashion.  That was the major strategic change that [Bhandari] made to that offering." (Exhibit 4, Bhandari Depo. Tr. at 19-20).

**C.**     **From April Through October 2007, Plaintiff Works For Bhandari's Group**

16.     In or around April 2007, Plaintiff began working for Mr. Bhandari's group in the position of Senior Director of Strategy and Market Development, Knowledge Solutions. (Meyers Aff., ¶ 9).  Mr. Bhandari reported to Glen Stettin. (Exhibit 11).  Prior to joining Bhandari's group, there was not a vacant and open job.  (SOMF, ¶¶ 15, 70).

17.     Prior to joining Mr. Bhandari's group, Plaintiff and Mr. Bhandari met no more than two times to discuss the possibility of Plaintiff joining his group. (Meyers Aff., ¶ 6).  In one of these meetings, Mr. Bhandari told Plaintiff to draft a job description of the role she would have in his group. (Meyers Aff., ¶ 6).

18.     On February 5, 2007, Plaintiff sent Mr. Bhandari a "Position Summary" setting forth her job description. (Meyers Aff., ¶ 7) (Exhibit 26).  After reviewing Plaintiff's "Position Summary," Mr. Bhandari agreed with Plaintiff's job description, which included the "First year metrics of success."  The "First year metric of success" was intended to be a mechanism for Medco, and Mr. Bhandari, to objectively evaluate Plaintiff's performance during her first year in Mr. Bhandari's group." (Meyers Aff., ¶ 8).

19.     According to the "Position Summary," Plaintiff's position included "driv[ing] revenue and margin from on Medco's data and information assets by driving go to market activities for products in development and identifying new markets for further development." (Exhibit 26).

20.     According to the "Position Summary," Plaintiff's "First year metrics of success" were:

- "Launch of Rational IQ (Commercialization, Sales, Margin):

- "Identify additional emerging data revenue and margin opportunities"

- "Establish the Chief Data Officer and Knowledge Solutions group as a core driver of value across Medco's emerging products."  (Exhibit 26).

21.     When Plaintiff joined Mr. Bhandari's group, one portion of her role was working on Rational IQ.  Plaintiff replaced Mr. Stratton in the strategic and marketing functions on Rational IQ.  Mr. Stratton was still expected to be the led in client presentations. (Meyers Aff., ¶ 10) (Exhibit 26).

22.     While Mr. Stratton continued to play a role in the sales function of Rational IQ, Mr. Bhandari testified that after Plaintiff joined his team Mr. Stratton "was also useful in a broader sense with, you know, with my broader role.  He was also useful in the Therapeutic Resource Centers to be able to take some of the integrated data insights and apply that broadly over and beyond Rational IQ."  (Bhandari Depo. Tr. at 30).

23.     Contrary to Defendant's claim in the SOMF, ¶ 25, the "Position Summary" demonstrates that Plaintiff's "job duties ... upon moving to Knowledge Solutions" included many aspects in addition to "com[ing] up with a strategy for selling Rational IQ and bringing it to market."  (Exhibit 26).  In addition to her work on Rational IQ, Plaintiff was responsible for opportunity identification in the Knowledge Solutions Group, which included reviewing and scoping opportunities for prioritization for both internal (within Medco) and external (outside Medco) markets. (Meyers Aff., ¶ 11).

24.     In 2007, Plaintiff was the only woman who reported directly to Mr. Bhandari. (Exhibit 11).

25.     While reporting to Mr. Bhandari, Plaintiff had a full-time desk.  She elected to work from her home in New York approximately one day per week. (Meyers Aff, ¶ 15).

26.    In August 2007, Mr. Bhandari instructed Plaintiff to prepare a "mid year review" by no later than August 31, 2007 in preparation for a mid-year performance review with Mr. Bhandari. (Meyers Aff., ¶ 16) (Exhibit 12).  Plaintiff submitted the mid-year review, but Mr. Bhandari did not schedule, or have, a meeting to review Plaintiff's performance at this time. (Exhibit 12) (Exhibit 28).

27.    In October 2007, Plaintiff updated the "mid-year review" that she had prepared earlier in the year.    (Exhibit 28).    The "mid-year review" memorialized Plaintiff's accomplishments through October 2007.  (Exhibit 28).  There is no evidence in the record that Mr. Bhandari, or anyone else at Medco, expressed any disagreement with Plaintiff's review of her performance through the first half of 2007. (Meyers Aff., ¶ 17).

**D.    In October 2007, Plaintiff Complained To Human Resources That Bhandari Treated Her Worse Than Her Male Colleagues**

28.    During 2007, Plaintiff believed that Mr. Bhandari treated her worse than he treated her colleagues (all of whom were men). (Meyers Aff., ¶ 18).  Specifically, although Plaintiff's performance was good, Plaintiff believed that Mr. Bhandari spoke to her in a belittling and disrespectful manner and cut her off whenever she was speaking. (Meyers Aff., ¶ 18).  Mr. Bhandari treated Plaintiff in this way in front of her colleagues, which conveyed to her colleagues that Mr. Bhandari did not respect her.  Plaintiff also believed that Mr. Bhandari treated her as if he believed that she was worthless and not capable of making thoughtful decisions. (Meyers Aff., ¶ 18).  In addition, Plaintiff noticed that Mr. Bhandari excluded her from meetings. (Meyers Aff., ¶ 18).

29.     Because of the way Mr. Bhandari treated her, Plaintiff met with Tara
Wolckenhauer, a Human Resources representative, between October 3 and October 17, 2007, to
complain about what she believed was unfair treatment by Mr. Bhandari. (Meyers Aff., ¶ 19).
Specifically, Plaintiff complained to Ms. Wolckenhauer that Mr. Bhandari spoke to her in a
disrespectful, and belittling, manner, and that he cut her off whenever she spoke. (Meyers Aff., ¶
19).   Plaintiff also told Ms. Wolckenhauer that Mr. Bhandari treated her worse than he treated
her colleagues (all of whom were men). (Meyers Aff., ¶ 19).   She also complained that Mr.
Bhandari excluded her from meetings and took her male colleagues in her place.  (Meyers Aff., ¶
19). At this meeting, Plaintiff was very emotional. (Meyers Aff., ¶ 19).  She was crying because
these issues were very sensitive to her and she was afraid that Mr. Bhandari and Medco would
punish her for making this complaint. (Meyers Aff., ¶ 19).  She told Ms. Wolckenhauer that she
feared retaliation by Mr. Bhandari and Medco. (Meyers Aff., ¶ 19).

30.     Ms. Wolckenhauer's testimony was nearly identical to Plaintiff's.  According to
Ms. Wolckenhauer, at this meeting, Plaintiff complained that, compared to the way Mr. Bhandari
spoke to the other people (all men) who reported to him, he was "curt, abrupt, and cut her off."
(Exhibit 1, Wolckenhauer Depo. Tr. at 99).  Ms. Wolckenhauer also testified that she believed
Plaintiff complained that Bhandari sent other people in her stead to meetings, but Wolckenhauer
could not identify who those other people were.  (Exhibit 1, Wolckenhauer Depo. Tr. at 100).
Because Plaintiff was the only woman who reported to Bhandari, the people who went to these
meetings in her place must have been men. Ms. Wolckenhauer described Plaintiff's demeanor at
the meeting as "highly emotional."  (Exhibit 1, Wolckenhauer Depo. Tr. at 101).

31.    Dr. Stettin testified that he knew that Plaintiff complained to Human Resources about the way Mr. Bhandari treated her.  (Exhibit 3, Stettin Depo. Tr. at 100).

32.    Tricia McDermott, a Human Resources representative, testified that Plaintiff initially met with Human Resources "because she was uncomfortable with the management style of Inderpal [Bhandari]." (Exhibit 2, McDermott Depo. Tr. at 54).

33.    Medco's Human Resources believed that Plaintiff had a stereotypically female reputation.  Ms. Wolckenhauer testified: "if I'm being honest, Amy has a reputation.  So I know Amy's reputation in the company. ... She's very I want it, I want it now.  You know, very – what's the word I'm looking for?  Quick to react.  And she can be very – difficult to work with. ... Yes, she's demanding. ... She wants answers, she wants them now.  She's not going to wait. She doesn't reflect.  She doesn't think."  (Exhibit 1, Wolckenhauer Depo. Tr. at 102-03).

34.    Ms. McDermott described Plaintiff as "high maintenance" (a word that is used to perpetuate a common, negative gender stereotype).  (Exhibit 2, McDermott Depo. Tr. at 57).

35.    Ms. Wolckenhauer's description of Plaintiff's "reputation" as an individual who is "demanding," "wants [answers] now," "doesn't reflect," and "doesn't think" is contrasted with Defendant's claim that Plaintiff's strengths "were strategy-related tasks, thinking through strategy-related issues and understanding data." (Def. SOMF, ¶ 9).


E.    **Bhandari Schedules A Meeting With Plaintiff For October 17, 2007 To Discuss Her Mid-Year Review, And Tells Plaintiff She Should Find A New Position**

36.    Ms. Wolckenhauer, the Human Resources representative, testified that during this period she had several conversations and/or meetings with Mr. Bhandari about Plaintiff. (Wolckenhauer Depo., at 48-49; 88-89; 91; 92; 108-09; 160).  Mr. Bhandari, however, testified

that he did not speak with Human Resources at all about Plaintiff. He stated unequivocally that during this time period:

- "I had not spoken to anyone in human resources." (Exhibit 4, Bhandari Depo. Tr. at 111).

- "I did not have any conversations with HR." (Exhibit 4, Bhandari Depo. Tr. at 122).

- "I did not have any conversations with HR." (Exhibit 4, Bhandari Depo. Tr. at 127).

37.    Mr. Bhandari set up a meeting with Plaintiff for October 17, 2007, purportedly to discuss her mid-year performance review. (Meyers Aff., ¶ 20) (Exhibit 12).

38.    Mr. Bhandari had no recollection of conducting a 2007 mid-year review for any other individual who reported to him (all men) other than Plaintiff. (Exhibit 4, Bhandari Depo. Tr. at 178).

39.    Mr. Bhandari testified that prior to this October 17, 2007 meeting purportedly for the purpose of giving Plaintiff a mid-year review he has had no recollection of reviewing the 2007 mid-year review (which included a list of accomplishments) that Plaintiff prepared at his instruction and submitted to him. (Exhibit 4, Bhandari Depo. Tr. at 180-81).

40.    Mr. Bhandari testified that before October 17, 2007 (approximately six months after Plaintiff began reporting to Mr. Bhandari) he decided that "no matter how hard [Plaintiff] tried … she wouldn't be able to succeed" because "[o]n the execution piece, she just doesn't pick up stuff that's coming back to her, you know, from the market, from the tactics she's trying to execute, she doesn't pick up on that." (Exhibit 4, Bhandari Depo. Tr. at 214).

41.    Because he concluded that Plaintiff "wouldn't be able to succeed," Mr. Bhandari testified that he told Plaintiff at the October17, 2007 meeting that she should start looking for

other opportunities "within Medco and outside of Medco. I wouldn't have made a distinction that way. She should start looking for other opportunities." (Exhibit 4, Bhandari Depo. Tr. at 185-86).

42.    At this meeting, the record establishes that Mr. Bhandari did not address Plaintiff's "Position Summary;" "First year metrics of success;" or "mid-year review." (Meyers Aff., ¶ 21).

43.    Prior to this October 17, 2007 meeting, Plaintiff had not received any "negative performance review" in Mr. Bhandari's group from Mr. Bhandari or Dr. Stettin. (Exhibit 3, Stettin Depo. Tr. at 93) (Meyers Aff., ¶ 22).  While Defendant characterizes Mr. Bhandari's "feedback" to Plaintiff prior to the October 17, 2007 meeting as "daily coaching" needed because of Plaintiff's poor performance, Mr. Bhandari testified:  "They were feedback. I don't know if I would call them criticisms. They were pretty objective feedback." (Exhibit 4, Bhandari Depo. Tr. at 183).

44.    In addition, Mr. Bhandari's testimony that Plaintiff required "daily coaching" during the "strategy tasks" she performed while working for him in 2007 is not consistent with Defendant's position in its SOMF (at ¶¶ 30 and 61) that Plaintiff performed the "strategy tasks" well. (Exhibit 4, Bhandari Depo. Tr. at 92).  Defendant claimed incorrectly that it was an undisputed fact that Plaintiff required "daily coaching" from Mr. Bhandari during the "execution" phase.

45.    Immediately after the October 17, 2007 meeting, Mr. Bhandari began looking for another job for Plaintiff at Medco. (Exhibit 13) (Exhibit 4, Bhandari Depo. Tr. at 188-89).

46. At this time, Dr. Stettin was not involved in looking for another job for Plaintiff. (Def. SOMF, ¶ 55).

47. After this meeting, Plaintiff made repeated efforts to contact Human Resources. No one from Human Resources responded to her calls. (Meyers Aff., ¶ 24).

**F.  Between October 17 And 25, 2007, Bhandari Decides To Stop Helping Plaintiff Find Another Position At Medco**

48. Mr. Bhandari admitted that through Dr. Stettin he "received an understanding ... in general that there was – that there had been a complaint about the review." (Exhibit 4, Bhandari Depo. Tr. at 127). Mr. Bhandari testified that Dr. Stettin did not provide him with any details about Plaintiff's "complaint" other than that "she was unhappy with the review." (Exhibit 4, Bhandari Depo. Tr. at 127).

49. On Thursday, October 25, 2007, Plaintiff spoke with Mr. Bhandari, and Mr. Bhandari formally terminated her from his group. During this conversation, Mr. Bhandari told Plaintiff that he "did not have a place for her in [his] department." (Exhibit 4, Bhandari Depo. Tr. at 170). Further, at this meeting, Mr. Bhandari communicated to Plaintiff that, "I think the message I was giving her is that my efforts on trying to find a place for her at Medco are over, because I didn't want to go on [looking for another job for Plaintiff] indefinitely. ... You know, she could do whatever she wanted here. She could make her own efforts to find a job. She could talk with Glen [Stettin]. She could talk to other managers. She could do what she wanted." (Exhibit 4, Bhandari Depo. Tr. at 203). Mr. Bhandari stated clearly, "What I told her was she needed to leave." (Exhibit 4, Bhandari Depo. Tr. at 205).

50.     Mr. Bhandari did not have any recollection of seeking, or obtaining, authorization from Dr. Stettin or Human Resources to remove Plaintiff from her position. (Exhibit 4, Bhandari Depo. Tr. at 204).

51.     The evidence establishes that Dr. Stettin neither authorized, nor knew that, Mr. Bhandari was going to tell Plaintiff that she needed to leave his group. (Exhibit 3, Stettin Depo. Tr. at 86-87) (Meyers Aff., at ¶ 27).

52.     Plaintiff tried to speak with both Dr. Stettin and Human Resources immediately after her meeting with Mr. Bhandari. (Meyers Aff., ¶ 26) (Exhibits 14, 30, 31, 32).

53.     Later on October 25, 2007 – having not heard from either Human Resources or Dr. Stettin – Plaintiff sent an email to Dr. Stettin indicating that:

> I just spoke with Inderpal.  I understand that he is reorganizing his group and that I am no longer needed as he would like to use the headcount for a different role.  I'd like to touch base with you to make sure that this is your understanding as well.  I also plan on reaching out to HR tomorrow (Friday). (Exhibit 31).

54.     Mr. Bhandari explained what he meant by reorganizing the group as follows: "Well, reorganizing the group in the sense that she needed to leave.  If you interpret that to be reorganizing the group, then yes, I told her." (Exhibit 4, Bhandari Depo. Tr. at 205).

55.     Mr. Bhandari replaced Plaintiff with Mr. Stratton, who was unsuccessful when he managed Rational IQ before Mr. Bhandari joined. (Exhibit 4, Bhandari Depo. Tr. at 51).

56.     Mr. Bhandari could not offer any reason why he believed Mr. Stratton would be more successful than Plaintiff at taking Rational IQ to market. (Exhibit 4, Bhandari Depo. Tr. at 225).

**G.    Medco Reassigns Plaintiff To Accetta's Group, Although There Is Not An Open Position**

57.    On October 26, 2007, Plaintiff spoke with Dr. Stettin about her conversation with Mr. Bhandari the previous day.  Based on Dr. Stettin's comments on this call, Plaintiff believed that Dr. Stettin had not authorized Mr. Bhandari to remove Plaintiff from her job and that he did not even know that Mr. Bhandari had done this.  On this call, Dr. Stettin did not inform Plaintiff that she would be reassigned to Ms. Accetta's group. (Meyers Aff., ¶ 27).

58.    Later that same day, Ms. McDermott told Plaintiff to report to her desk on Monday (October 29), and that she would be told what to do then because it had not yet been decided. (Meyers Aff., ¶ 27).

59.    According to Defendant's internal records, Medco reassigned Plaintiff to Ms. Accetta's group around November 20, 2007. (Exhibit 15).  Ms. Accetta, who had the same title as Plaintiff reported to Chris Bradbury, who had the same title as Mr. Bhandari. (Exhibit 11).

60.    Prior to Plaintiff's assignment to Ms. Accetta's group, this position did not even exist at Medco.  It did not appear on any of the Organizational Charts.  There was no formal job posting. (Meyers Aff., ¶ 28)  Ms. Accetta testified that this was not an open position, and that she did not ask to hire anyone for this position. (Exhibit 5, Accetta Depo. Tr. at 41)  Ms. Accetta did not know what Plaintiff's title was in the position reporting to her (Accetta). (Exhibit 5, Accetta Depo. Tr. at 81) (Exhibit 35).  Dr. Stettin was unable to identify for Plaintiff what her role would be working for Ms. Accetta. (Exhibit 34).  In addition, Plaintiff's position reporting to Ms. Accetta had less responsibility, no opportunity for advancement, and substantially less job security. (Meyers Aff., ¶ 28).

61.     Dr. Stettin explained Medco's decision to reassign Plaintiff to Ms. Accetta as follows: "I think that the thing that was noteworthy is that it was rushed.  And that, you know, it was – Amy had a sticky situation with the relationship between Amy and Inderpal [Bhandari]. And we needed someplace for Amy to be that wasn't reporting to Inderpal."  (Exhibit 3, Stettin Depo. Tr. at 143).

**H.     At The Direction Of Stettin, Bhandari Circulates A False, Negative Review Of Plaintiff's Performance To Justify After-The-Fact His Decision To Remove Her From His Group**

62.     After Mr. Bhandari had already removed Plaintiff from his group and terminated his efforts to find her another job at Medco (both without Dr. Stettin's authorization or knowledge), Dr. Stettin told Mr. Bhandari that, "We need you to write down your reasons as to why you think Amy is not fit for the job."  (Exhibit 4, Bhandari Depo. Tr. at 106-07).

63.     In November 2007, at the direction of Dr. Stettin, Mr. Bhandari drafted a review of Plaintiff's performance while she reported to him that was intended to justify Mr. Bhandari's decision to remove her from his group.  (Exhibit 10).

64.     Although Dr. Stettin and Mr. Bhandari both testified that this document (Exhibit 10) was created to document Plaintiff's "performance in the role in [Bhandari's] department" (Exhibit 3, Stettin Depo. Tr. at 144) and to explain why Bhandari thought Plaintiff was not a good fit in his department, in the first paragraph of the document Bhandari writes, "[Plaintiff] was very ambitious and wanted to be promoted to Grade 3.  Unfortunately, for reasons detailed below, I came to conclude that she was not strong enough as a performer in the role that she was playing in my department to merit a promotion."  (Exhibit 10).   It is inconsistent that Mr.

Bhandari would begin a review intended to justify removing Plaintiff from his group for poor performance by stating that he "conclude[d]" she did not "merit a promotion."

65.     In his November 2007 review, Mr. Bhandari concluded that Plaintiff "has come as far as she can at Medco" and that he expects "the tension between her view of where she feels she deserves to be and where Medco feels that she should be will continue to contribute to her unhappiness while she works for us." (Exhibit 10).  Mr. Bhandari also recognized that Plaintiff would not want to stay at Medco if she could not be promoted, and then concluded that she was not capable of being promoted.  (Exhibit 10).

66.     Mr. Bhandari's false, negative review communicated his belief that Plaintiff did not, and should not, have a future at Medco.  (Exhibit 10).

67.     Contrary to Defendant's assertions in defense of Plaintiff's claims, Mr. Bhandari testified at his deposition that Plaintiff did not perform the "strategy tasks" well and instead required daily coaching from Mr. Bhandari. (Exhibit 4, Bhandari Depo. Tr. at 92).

> Q.     How did she perform on the initial strategy piece?
>
> A.     Reasonable.  She did a reasonable job on that.  She needed a lot of coaching.  I had to coach her through it, but she was okay.  (Exhibit 4, Bhandari Depo. Tr. at 92).
>
> Q.     Did you ever talk to Dr. Stettin about any issues you had with [Plaintiff] during the initial strategy piece?
>
> A.     I don't recall.  I would have possibly mentioned it to Dr. Stettin that, you know, she needed a lot of coaching.  (Exhibit 4, Bhandari Depo. Tr. at 92).

68.     Mr. Bhandari's November 2007 does not address Plaintiff's job description memorialized in the "Position Summary," her First year metrics of success, or her mid-year performance review that included her 2007 accomplishment.  (Exhibit 10).

69.     Mr. Bhandari's November 2007 review was circulated to Dr. Stettin, Mr. Bradbury, Ms. Accetta, and Human Resources. (Exhibit 10). Prior to the creation of this document, the record does not contain any negative review of Plaintiff's work for Mr. Bhandari.

70.     It is not credible that Mr. Bhandari's false, negative review that was seen by Dr. Stettin, Mr. Bradbury, Ms. Accetta, and Human Resources (all involved in the decision to select only Plaintiff for termination in 2008) concluding that Plaintiff "has come as far as she can at Medco" did not impact Medco's termination decision.

I.      **With Accetta (A Woman) Conducting Her Performance Reviews, Plaintiff Has No Performance Issues In 2007 And 2008**

71.     According to Defendant's internal documents, Medco transferred Plaintiff to Ms. Accetta's group after November 20, 2007. (Exhibit 15).

72.     In this position, Medco told Plaintiff that there was no room for her to work in the office and that she did not even have an office, but that she could share Marie Lambert's desk in her office 2.5 days per week (on Monday, Tuesday, and every other Friday) because she only used it part-time. Plaintiff was asked to work from home the other 2.5 days per week. (Exhibit 16) (Meyers Aff., ¶ 29). Plaintiff did not volunteer to share a desk or to work from home. (Meyers Aff., ¶ 29). According to Mr. Bradbury, there is "a benefit to regular in person interaction." (Exhibit 20).

73.     Contrary to Mr. Bhandari's November 2007 review, Plaintiff's formal 2007 year-end performance review was very positive. (Exhibit 17). In connection with this review, Plaintiff submitted her 2007 Accomplishments. (Exhibit 36). Ms. Accetta conducted Plaintiff's

2007 year-end review, which she conducted by soliciting feedback from individuals who worked with Plaintiff in 2007.  (Exhibit 5, Accetta Depo. Tr.  at 93).  Medco's formal 2007 year-end review (Exhibit 17) indicates, among other positive comments, that:

- "Amy displays exceptional abilities to develop a strategy."

- "She demonstrated a broad application and was valued as the subject matter expert on the team."

- "Amy displayed leadership traits appropriate to the situation.  She works well in cooperation with others for the benefit of the organization."

- "This project was challenging yet she continued to share ideas/techniques.  She demonstrated the ability to achieve desired results."

In Plaintiff's 2007 review, Ms. Accetta struggled to find "Development Opportunities," instead taking the opportunity to further praise Plaintiff's strategic abilities and only stating that perhaps she could grow with regards to her leadership abilities.  This sole "development opportunity" does not mention tactical deficiencies and appears to reflect the fact that Plaintiff was not placed in a leadership position within Ms. Accetta's group.  (Exhibit 37).

74.   Both Ms. Accetta and Mr. Bhandari testified that Mr. Bhandari contributed feedback on Plaintiff's performance to Plaintiff's 2007 year-end review.  (Exhibit 5, Accetta Depo. Tr. at 86) (Exhibit 4, Bhandari Depo. Tr. at 212).

75.   There is no credible explanation in the record to explain why none of the negative comments allegedly used by Mr. Bhandari to justify removing Plaintiff from his group in October 2007 were mentioned in Plaintiff's 2007 year-end performance review.

**J.**    **Despite The Group's Growth And No Other Employee Terminations, Defendant Disingenuously Called Plaintiff's Termination An "Economic Downsizing"**

76.    Mr. Bhandari's plan to market Rational IQ as a stand-alone consulting service was not successful, and Dr. Stettin made a business decision to de-emphasize Rational IQ.  In 2008, shortly after Bhandari removed Plaintiff form his group (Exhibit 3, Stettin Depo. Tr. at 25), Medco decided to "bundle" Rational IQ with Rational Med (a separate service offering managed by Mr. Bradbury) because "we couldn't make the investment or continue to make the investment in it.  We weren't having sort of the traction that we hoped.  And from – since we weren't able to make further investment than the developing or advancing the product, and we had some clients that were happy with what we had, we sort of figured out a way to continue it without making it a big area of emphasis for us."  (Exhibit 3, Stettin Depo. Tr. at 25).  Once this change took place, "[w]e were essentially – in my mind what we needed to do was to piggyback something on top of all these efforts.  And just – because we already have such a big customer base, that way we could grow that base by piggybacking on top of all the efforts we already had going."  (Exhibit 4, Bhandari Depo. Tr. at 20).

77.    In 2008, when Medco "bundled" Rational IQ with Rational Med, Plaintiff was one of the most knowledgeable people in Dr. Stettin's group on both offerings, making her even more valuable going forward. (Meyers Aff., ¶ 31).  Plaintiff had conducted training for the sales people and the product team on both Rational IQ and Rational Med. (Meyers Aff., ¶ 31).

78.    In addition, there is no evidence in the record that Plaintiff had any performance issues in 2008.  (Def. SOMF, ¶ 92).  Mr. Bradbury testified that he gave her the same review for 2008 that she was given for 2007.  (Exhibit 8, Bradbury Depo. Tr.  at 104).

79.     Unbeknownst to Plaintiff, her position reporting to Ms. Accetta was a temporary position.  Mr. Bradbury testified that the position was eliminated upon Plaintiff's successful completion of the initial list of tasks.  (Exhibit 3, Stettin Depo. Tr. at 114).

80.     Ms. Accetta testified that she never learned why Plaintiff's employment was terminated.  (Exhibit 5, Accetta Depo. Tr. at 72) ("Q. Sitting here now, have you ever learned why she was chosen for this?  A. Absolutely not.").

81.     Although Defendant claims that it eliminated Plaintiff's position in late 2008 as part of an "economic downsizing," the record establishes that eliminating Plaintiff's position was the only consequence of the alleged needed "cost cuts."  Defendant has not offered any other evidence, and none exists in this record, that Dr. Stettin's group took any cost cutting measures at this time other than eliminating Plaintiff's position and terminating her employment.  In addition, Mr. Bradbury could not indentify anything he did to try to cut costs other than the termination of Plaintiff's employment.  (Exhibit 8, Bradbury Depo. Tr. at 109; 115-16).

82.     The evidence establishes that Dr. Stettin's group's 2008 performance was strong.  According to Edward Redling, the bonus plan – which was arrived at based on the group's yearly performance – was "very close" from 2007 to 2008, and he could not even remember which year was better.  (Exhibit 7, Redling Depo. Tr. at 59-60).  He also testified that Medco determined to pay Plaintiff the same bonus for 2008 that she was paid in 2007 based on the company's comparable performance.  (Exhibit 7, Redling Depo. Tr. at 58).

83.     Mr. Bradbury testified that his group was still growing from the end of 2007 to the end of 2008, and revenues grew in 2008.  (Exhibit 8, Bradbury Depo. Tr. at 109; 113).  And specifically, he testified that between 2007 and 2010 his group grew its number of employees by

more than 25%. (Exhibit 8, Bradbury Depo. Tr. at 30). Mr. Bradbury also testified that on a monthly basis he reviewed his group's profits and loss statements and financial projections, and that prior to Stettin telling him that he was over budget, he had not made a similar determination based on his own review of the documents. (Exhibit 8, Bradbury Depo. Tr. at 118-19).

84.    Mr. Bradbury testified that Dr. Stettin held a meeting with all of his direct reports (including Mr. Bradbury) and told them that he (Stettin) "was asked to reduce his team's costs …." (Exhibit 8, Bradbury Depo. Tr. at 107). Defendant failed to produce a single document that corroborates its claim that Dr. Stettin was instructed, and trying, to cut costs at that time.

85.    According to Defendant, Dr. Stettin asked each of his direct reports (not just Mr. Bradbury) "to assess our groups to see where the opportunity and best place to [cut costs] was." (Exhibit 8, Bradbury Depo. Tr. at 108). Defendant failed to produce a single document that corroborates its claim that Dr. Stettin asked each of his direct reports to identify areas to cut costs.

86.    Mr. Bradbury testified that he "determined that there were some opportunities [to cut costs] and came up with a recommendation for Glen [Stettin]." (Exhibit 8, Bradbury Depo. Tr. at 109). Mr. Bradbury proposed three people to Dr. Stettin: Peter Hoffman, Karen Garvey, and Plaintiff. (Exhibit 8, Bradbury Depo. Tr. at 110). Of this list, Dr. Stettin selected only Plaintiff. (Exhibit 8, Bradbury Depo. Tr. at 111-13) (Exhibit 3, Stettin Depo. Tr. at 173). Defendant failed to produce a single document that corroborates Mr. Bradbury's claim that he proposed three people to Dr. Stettin.

87.    Defendant failed to produce any evidence that anyone other than Mr. Bradbury even proposed any cost cutting measures or terminations.

88.     Further, Defendant's allegations concerning how Plaintiff's termination decision was made are false and misleading.  In its SOMF, ¶ 90, Defendant claims falsely that Ms. Accetta made the decision to terminate Plaintiff's employment, although Ms. Accetta testified that she did no such thing.  (Exhibit 5, Accetta Depo. Tr. at 72).  In its SOMF, ¶ 90, Defendant also claims misleadingly that Mr. Bradbury and Ms. Accetta proposed that Dr. Stettin eliminate Patricia Mazzone's position, when the record actually establishes that Ms. Mazzone – who reported directly to Dr. Stettin, not to Mr. Bradbury – voluntarily resigned because, according to Dr. Stettin, "she was nearing retirement and was ready …."  (Exhibit 3, Stettin Depo. Tr. at 177). Ms. Mazzone was the only woman who reported directly to Dr. Stettin.  (Exhibit 11).

89.     Plaintiff was the only employee in Dr. Stettin's 125-person group whose employment was involuntarily terminated as part of the alleged cost cutting measures.  The only other person in Dr. Stettin's group who was part of this reduction in force was Ms. Mazzone, but – as discussed above – she asked to get a separation package.

90.     No employees from Dr. Stettin's 125-person group other than Plaintiff and Ms. Mazzone appeared on the list of severed employees.  (Exhibit 21) (Exhibit 3, Stettin Depo. Tr. at 177).

## K.     Medco Paid Plaintiff Her 2008 Bonus Because She Worked The Entire Year And Performed Well

91.     On January 8, 2009, Medco terminated Plaintiff's performance and, at that time, gave her a termination letter, which included a copy of the Medco Health Solutions, Inc. Severance Plan (the "Severance Plan").  (Exhibit 10).

92.     According to the January 8, 2009 letter:  "You are eligible for certain pay and benefits under the Medco Health Solutions, Inc. Severance Plan.  Under the terms of the Plan, you

will receive severance pay and benefits for a period of 20 weeks from January 9, 2009 to May 28, 2009 and outplacement benefits for 6 months.  In addition, you will receive a discretionary bonus of $40,000.00 for performance year 2008.  All payments are subject to applicable withholdings.  In order to receive severance pay and benefits under the Plan you must sign and return the enclosed Release of Claims.  Your severance payment will not commence until after the 7 day revocation period for the Release of Claims has expired and the Release of Claims has become effective."  (Exhibit 19).

93.   The Severance Plan was an ERISA Plan.  (Exhibit 19).

94.   The Severance Plan sets forth in detail the "Severance Plan Benefits" on pages 8-11.  (Exhibit 19).

95.   The first section within the Severance Plan Benefits is called "Severance Pay."  (Exhibit 19).  According to the Severance Pay section, "A Covered Employee's Severance Pay for a Separation From Service is determined by pay, grade level and years of Continuous Service from the Covered Employee's most recent date of hire determined as of the Covered Employee's Separation Date according to the following schedule ...."

96.   Although the Plan does not include bonus compensation as Severance Pay, both Ms. Webber and Ms. Wolckenhauer testified untruthfully that the bonus was part of the Severance Pay.

Q. Is it your testimony that the $40,000 bonus was severance pay?

A. Yes.  Under the severance pay plan, it's a severance payment under the plan.  (Exhibit 9, Webber Depo. Tr. at 33).

Q. Your testimony is that the bonus was part of the severance paid benefit plan?

A. Yes.  (Exhibit 1, Wolckenhauer Depo. Tr. at 253).

97.     There is no evidence in this record that the Senior Vice President, Human Resources (who was identified as Karen Princivalle) submitted "a written recommendation" to determine eligibility for bonus compensation pursuant to the terms of the Plan.

98.     Medco did not have a "policy" that "severed employees would receive the same bonus as in the previous year, subject to the signing of a release of claims." (Exhibit 9, Webber Depo. Tr. at 17). Medco only paid a 2008 bonus to severed employees with a "performance level that warranted a bonus." (Exhibit 9, Webber Depo. Tr. at 13).

99.     Defendant's claim in ¶ 98 of its SOMF that "[t]he amount of bonus was not determined based on Plaintiff's performance during 2008, nor on the basis of input from Plaintiff's managers" is false. Ms. Webber testified: "It's a discretionary bonus, which is determined based on the employee being, a – being at the performance level that warranted a bonus. … That determination was made by human resources in consultation with the manager. … We would have looked at the employee's performance rating for the prior year, or history for the prior year, and made that determination." (Exhibit 9, Webber Depo. Tr. at 13; 18-19). Ms. Webber said that a manager reviewed Plaintiff's 2008 performance to decide whether she was eligible to receive a 2008 bonus. (Exhibit 9, Webber Depo. Tr. at 19).

100.    Defendant paid Plaintiff a 2008 bonus because her "performance [] warranted receiving a bonus …." (Exhibit 9, Webber Depo. Tr. at 18).

**L.     After Learning That Plaintiff Filed An EEOC Charge of Discrimination, Defendant Sent Plaintiff A Letter Demanding That She Return Her 2008 Bonus Because It Was Paid In "Error"**

101.    Defendant's payment "system" – set up by Defendant – was programmed to only pay the severance pay if the release was signed but to pay the bonus even if the release was not

signed.   Ms. Webber testified that its "system" that tracks the payment of severance pay and the signing of releases "is not configured to, to take the [bonus] payment out if the release isn't signed. It's just not programmed that way." (Exhibit 9, Webber Depo. Tr. at 38).   However, the system is configured to automatically withhold paying the severance pay until the release is signed. (Exhibit 9, Webber Depo. Tr. at p. 30).

102.   Defendant was able to configure its payment "system" to take the bonus payment out if the release is not signed, but it chose not to do so.

103.   Ms. Webber knew that Plaintiff filed her EEOC Charge of Discrimination before the March 26, 2009 letter was sent out. (Exhibit 9, Webber Depo. Tr. at 24-25).

104.   Defendant made a misrepresentation to this Court when it insinuated in ¶ 108 of its SOMF that Ms. Webber did not know that Plaintiff had filed an EEOC Charge before she instructed Ms. Wolckenhauer to write the letter.  Because Defendant lied about this, it allows a fact finder to dispute the claim that Ms. Webber directed Ms. Wolckenhauer to write this letter.

105.   Jack Shea, Esq. was Medco's in-house counsel assigned to handle Medco's defense of Plaintiff's allegations of gender-based discrimination and retaliation.

106.   Mr. Shea was assigned to handle Medco's defense of Plaintiff's allegations of gender-based discrimination and retaliation prior to March 26, 2009. (SOMF, ¶ 104).

107.   Mr. Shea was cc'd on the March 26, 2009 letter that Ms. Wolckenhauer sent to Plaintiff demanding that Plaintiff return her 2008 bonus because Mr. Shea was involved in the decision to send this letter. (Exhibit 18).

**L.    Kornwasser Calls Plaintiff To Pursue Re-Hiring Her To Medco, But Ends The Conversation When He Learns Her Discrimination And Retaliation Claims Are Still Pending**

108.    On February 14, 2011, Mr. Kornwasser called Plaintiff because he learned of a potential job opportunity for her at Medco. (Exhibit 22) (Exhibit 6, Kornwasser Depo. Tr. at 79-80). Specifically, Kornwasser learned that the Business Development Group (which he used to run, and where Plaintiff used to work) was having problems with a data agreement and he believed Plaintiff might be the appropriate candidate for the position. (Exhibit 6, Kornwasser Depo. Tr. at 79-80).

109.    At the time that Mr. Kornwasser made this call, he was one of the ten most senior employees at Medco. (Exhibit 6, Kornwasser Depo. Tr. at 75).

110.    It was common at Medco to hire an employee even if there was no specific job. Indeed, Medco transferred Plaintiff into both Mr. Bhandari's, and Ms. Accetta's, group although there was not a pre-existing job title and available position. (Def. SOMF, ¶¶ 15, 70) When Medco hired Mr. Bhandari to a full-time job, there was not an open and vacant position. (Exhibit 4, Bhandari Depo. Tr. at 9-10).

111.    Defendant did not offer any evidence that establishes that Plaintiff would have worked in New Jersey if she had decided to accept Mr. Kornwasser's offer of employment.

112.    When Mr. Kornwasser called Plaintiff he was not aware that she had an ongoing lawsuit alleging gender discrimination and retaliation against Medco. (Exhibit 22) (Exhibit 6, Kornwasser Depo. Tr. at 92).

113.    On the phone call, Plaintiff told Mr. Korwasser that she did indeed have these claims pending against Medco. (Exhibit 22) (Exhibit 6, Kornwasser Depo. Tr. at 93). Upon learning this – and because of these claims – Mr. Kornwasser immediately ended the

conversation and did not offer Plaintiff the job or even continue to consider her for this position. (Exhibit 22) (Exhibit 6, Kornwasser Depo. Tr. at 93).

114.   Mr. Kornwasser told Plaintiff that if the lawsuit "gets closed out" he would consider her again for this position.  (Exhibit 6, Kornwasser Depo. Tr. at 93).

## 2. DEFENDANT'S STATEMENT OF MATERIAL FACTS

<u>Response to Defendant's Paragraph 1</u>:       Admitted that Defendant's Depo Ehx. 5 contains a copy of Plaintiff's initial offer letter dated March 26, 2004 that indicates her position will be Senior Director, Corporate Strategy & Business Development and a copy of the revised offer letter dated March 30, 2004 that indicates her position will be Director, Corporate Strategy & Business Development.

Admitted that Plaintiff reported to Laizer Kornwasser from the time she joined Medco until Mr. Kornwasser was promoted in 2006.

<u>Response to Defendant's Paragraph 2</u>:       Admitted.

<u>Response to Defendant's Paragraph 3</u>:       Admitted that the quotation is accurate.

<u>Response to Defendant's Paragraph 4</u>:       Admitted that Key Employment Agreement has a section on Confidential Information.

<u>Response to Defendant's Paragraph 5</u>:       Admitted that the quotation is accurate.

<u>Response to Defendant's Paragraph 6</u>:        Admitted that in late 2004, Plaintiff's title became a

Senior Director.  <u>See</u> Plaintiff's Response to Defendant's Paragraph 1.

It is a disputed issue of fact whether "[t]his was not a promotion …." <u>See</u> Material Facts

To Be Tried ("Material Facts"), ¶ 3.   Defendant's March 26. 2004 offer letter to Plaintiff

reflected the title of Senior Director.  Defendant revised this offer and presented Plaintiff with an

offer letter on March 30, 2004 reflecting the title Director.   <u>See</u> Plaintiff's Response to

Defendant's Paragraph 1.   This evidences that Medco believed this title distinction was

significant.

In addition, Plaintiff testified that she was awarded the Senior Director title because she

was performing Senior Director level work.  <u>See</u> Material Facts, ¶ 3.  (Meyers Depo. Tr. at 48).

Plaintiff testified that although her pay did not increase in 2005 immediately following her

promotion, she did receive a pay increase during "the annual pay cycle." (Meyers Depo. Tr. at

57-58).

Ms. Wolckenhauer only testified that a change of title from Director to Senior Director

does not "necessarily" result in increased pay, not that it cannot result in increased pay.  (Exhibit

1, Wolckenhauer Depo. Tr. at 125-126).

<u>Response to Defendant's Paragraph 7</u>:        Admitted that the quotations are accurate and that

Mr. Kornwasser rated Plaintiff as "Exceeds Expectations," the second highest rating that Plaitniff

could have received.  Further, Mr. Kornwasser evaluated Plaintiff's performance in six different

areas, determining that she "Delivered on Objective" in all six areas.  (Exhibit 25).

<u>Defendants Paragraph 8</u>:        Admitted.


<u>Response to Defendant's Paragraph 9</u>:        Denied except to admit that the direct quotations are

accurate.  <u>See</u> Material Facts, ¶¶ 3, 109, 110, 114, 115.

It is a disputed issue of fact whether "[b]y mid-2006, Mr. Kornwasser had determined

that Plaintiff was ineffective in her role in this group."  Mr. Kornwasser testified that he rated

Plaintiff as a "contributor" and that she "met expectations."  (Exhibit 6, Kornwasser Depo. Tr. at

37-38).  Mr. Kornwasser awarded Plaintiff these ratings because the Business Development

group did not "maximize her strengths."  (Exhibit 6, Kornwasser Depo. Tr. at 37-38).  According

to Plaintiff, Mr. Kornwasser told her that she would have a better opportunity for career

advancement if she worked outside of the Business Development Group because of the small

size of that group.  (Meyers Aff., ¶ 3).  Furthermore, Mr. Kornwasser declined to characterize

these ratings as "negative."  (Exhibit 6, Kornwasser Depo. Tr. at 42-43).

It is a disputed issue of fact whether Plaintiff's strengths "were strategy-related tasks,

thinking through strategy-related issues and understanding data."  Defendant cites to a portion of

Mr. Kornwasser's deposition transcript that is incomprehensible.  Mr. Kornwasser testified as

follows:

Q.      Were you responsible for putting her in the not performing up to par box?

A.      Yes.

Q.      What lead to that?

A.      The business development role was not one that maximized her strengths.

Q.      Why do you say that?

A.   I don't understand the question.

Q.   I don't know what that means when you say that. So why do you say that?

A.   She wasn't effective in her business development role.

Q.   What led you to that conclusion?

A.   Amy was very good in strategy. But Amy would need a lot of guidance and structure to execute. And the business development role is one where you need to be able to execute more on your own.

Q.   What does it mean when you use the word execute in this context?

A.   The ability to negotiate deals **or think through deals** without me giving very clear direction and guidance, versus allowing me to play an adviser role.

Q.   **So you thought that she was not good at thinking through deals, is that correct?**

A.   **No, that's not what I said.**

Q.   **But isn't that –**

A.   **Amy was able to think through deals. Her challenge was executing them.** (Exhibit 6, Kornwasser Depo. Tr. at 38-39).

Thus, in the same series of questions, Mr. Kornwasser first testified that Plaintiff's problem was her ability to "execute," which he defined as the ability to "negotiate deals or think through deals," and then immediately thereafter said "Amy was able to think through deals. Her challenge was executing them." This testimony is incomprehensible and not credible.

In addition, Mr. Kornwasser criticized Plaintiff's ability to analyze financial information when forced to identify tactical weaknesses, while simultaneously citing her ability to analyze financial information as a strength that permitted her to excel strategically. (Exhibit 6, Kornwasser Depo. Tr. at 37-41).

Response to Defendant's Paragraph 10:      Admitted that Mr. Kornwasser told Plaintiff that she would have a better opportunity for career advancement if she worked outside of the Business Development Group, but these comments were not delivered in a critical way. (Meyers Aff., ¶ 3). The portion of the deposition that Defendant cites in support of this paragraph establishes that even Mr. Kornwasser never thought Plaintiff's matched what was needed in Business Development.  (Exhibit 6, Kornwasser Depo. Tr. at 44).

Response to Defendant's Paragraph 11:      Denied.   See Plaintiff's Response to Defendant's Paragraph 9.

Response to Defendant's Paragraph 12:      Denied that Mr. Kornwasser gave Plaintiff a negative performance review.  See Plaintiff's Response to Defendant's Paragraphs 9, 10.

Admitted that Plaintiff and Mr. Kornwasser continued to speak after Mr. Kornwasser left Business Development in 2006.

Response to Defendant's Paragraph 13:      Admitted.

Response to Defendant's Paragraph 14:      Admitted that Plaintiff began reporting to Mr. Moriarity following Mr. Kornwasser's promotion.

Denied that the record has any credible, admissible evidence to support Defendant's contention that "Mr. Moriarty also had issues with Plaintiff's performance in his group."

Defendant cited to deposition testimony offered by Mr. Bhandari that Dr. Stettin told him (Bhandari) "there were concerns around [Plaintiff's] performance" but that he did not recall any details. (Exhibit 4, Bhandari Depo. Tr. at 67-69). Dr. Bhandari was unable to identify the source of these "concerns around [Plaintiff's] performance," or even the general nature of those concerns. (Exhibit 4, Bhandari Depo. Tr. at 67-69)  Defendant asserts Dr. Bhandari's vague statements were in fact a reference to Mr. Moriarty's critique of Plaintiff to Dr. Stettin – this is simply not Dr. Bhandari's testimony.  Moreover, Mr. Bhandari cannot testify that Dr. Stettin told him (Bhandari) that Mr. Moriarty had issues with Plaintiff to establish the truth of that claim.  It would be double hearsay.

The only admissible evidence in the record concerning Plaintiff's performance while she reported to Mr. Moriarty is Plaintiff's undisputed testimony that he nominated for a "President's Award," pursuant to which she was paid an additional bonus in May 2007. See Material Facts, ¶ 6.


Response to Defendant's Paragraph 15:        Denied.  See Material Facts, ¶ 6.

The sole support Defendant offered for the facts contained in this paragraph is inadmissible hearsay.


Response to Defendant's Paragraph 16:        Admitted.


Response to Defendant's Paragraph 17:        Denied.  See Material Facts, ¶¶ 7, 8.

<u>Response to Defendant's Paragraph 18</u>:        Denied.  <u>See</u> Material Facts, ¶¶ 9, 10, 11, 12, 13, 14, 15, 76, 77.

The transcript pages cited by Defendant do not establish, or even intimate, that "[t]he members of Dr. Stettin's group were experts on Rational IQ ...."  In addition, the record establishes that at different times Rational IQ existed in different forms, and therefore it is not accurate to say that "Rational IQ was marketed mostly to prescription benefit plans, health insurers and medical plan sponsors."

<u>Response to Defendant's Paragraph 19</u>:        Denied.  <u>See</u> Material Facts, ¶¶ 9, 10, 11, 12, 13, 14, 15, 76, 77.

Admitted that Mr. Bhandari testified that he believed Mr. Stratton was not a good manager and that he failed to successfully manage Rational IQ.

The evidence in the record does not establish that Mr. Bhandari was "hired in part to replace Scott Stratton ...."

<u>Response to Defendant's Paragraph 20</u>:        Admitted that "[a]fter Dr. Bhandari joined Medco [on a full time basis], Mr. Stratton began to report directly to Dr. Bhandari ...."

Admitted that Mr. Bhandari "took away most of the people Mr. Stratton managed because he was not an effective manager."

Denied that "Mr. Stratton then focused more on the development of Rational IQ rather than managing the business." <u>See</u> Material Facts, ¶ 22.

<u>Response to Defendant's Paragraph 21</u>:      Denied.

According to Dr. Stettin, "[a]t Tom [Moriarty's] request [he] looked for a position and a role in [his] group [for Plaintiff] ...." (Exhibit 3, Stettin Depo. Tr. at 66). Thus, while Mr. Bhandari claimed at his deposition that "I made the decision to hire [Plaintiff]," the evidence presented by Dr. Stettin – Mr. Bhandari's manager – establishes that it was a decision made by Dr. Stettin and Mr. Moriarty.


<u>Response to Defendant's Paragraph 22</u>:      Denied.

The transcript pages cited by Defendant do not establish that "Plaintiff had issues working with Messrs. Kornwasser, Moriarty, and Driscoll ...."

Disputed issues of fact exist regarding Dr. Stettin's opinion of Plaintiff's performance. At his deposition, Dr. Stettin described Plaintiff as follows: "I thought she was bright. I thought that she was dedicated. I thought that she was – sort of had poor execution in project management skills, which I personally coached her about. I thought that – you know, I have a lot of respect for smart people – and as a think – and I thought that she could help us from a standpoint of strategy. And I thought that some of the issues around project management and execution were things that we could coach and help her with." (Exhibit 3, Stettin Depo. Tr. at 68). However, Plaintiff received positive performance reviews for 2007 and 2008, the two years she worked in Dr. Stettin's group. <u>See</u> Material Facts, ¶¶ 73, 74, 75, 78. There is no contemporaneous evidence in the record to support the negative appraisal of Plaintiff's performance contained in Defendant's Paragraph 22.

Defendant also claims that "Messrs. Moriarty and Kornwasser agreed with Dr. Stettin's 'inclination … to give [Plaintiff] another chance …." This evidence is inadmissible hearsay. In particular, Defendant's attempt to offer Dr. Stettin's testimony regarding what Mr. Kornwasser said when Mr. Kornwasser was also deposed in this case is not appropriate. Further, the only competent evidence in this record concerning Mr. Moriarty nominated Plaintiff for a President's Award, which she received in May 2007. See Material Facts, ¶ 6. In addition, the contention that Mr. Kornwasser believed Plaintiff had performance problems is undermined, or at least disputed, by Mr. Kornwasser's attempt to re-hire her in 2011 to return to the Business Development Group. See Material Facts, ¶¶ 109, 110, 114, 115.

Response to Defendant's Paragraph 23:        Denied.

The record does not establish that Plaintiff "had performance problems in her previous roles under Messrs. Kornwasser, Moriarty, and Driscoll." See Plaintiff's Response to Defendant's Paragraph 22.

It is a disputed issue of fact whether Mr. Bhandari agreed to hire Plaintiff into his group even though he was told she "wasn't performing" because he believed "Plaintiff might have been a good fit for his group even though she was not a good fit for another group." Mr. Bhandari's testimony to this effect is not credible. For instance, he claims that he was able to make this assessment although he had no recollection of speaking to Human Resources or seeing any documents that addressed her performance. (Exhibit 4, Bhandari Depo. Tr. at 69). Mr. Bhandari also had no recollection of meeting with any other potential candidates for the position. (Exhibit 4, Bhandari Depo. Tr. at 69).

Moreover, Mr. Bhandari's testimony regarding *why* he believed she was a good fit for his group even though he heard she "wasn't performing" is not credible. He said: "It was generally known that she was pretty smart. I can work with smart." (Exhibit 4, Bhandari Depo. Tr. at 68-69). Accordingly, Mr. Bhandari had no legitimate basis to conclude he believed Plaintiff was a good fit for his group.

Casting further doubt on Mr. Bhandari's claim, Ms. Wolckenhauer actually testified that Plaintiff had a "reputation" as someone who "doesn't reflect" and "doesn't think." See Material Facts, ¶¶ 33, 34, 35. Thus, it is unlikely that Mr. Bhandari simply heard that Plaintiff was "smart" and decided she was a good fit for his group.

<u>Response to Defendant's Paragraph 24</u>:     Denied.  <u>See</u> Material Facts, ¶ 17.  <u>See</u> Plaintiff's Response to Defendant's Paragraph 23.

<u>Response to Defendant's Paragraph 25</u>:     Denied.  <u>See</u> Material Facts, ¶¶ 17, 18, 19, 20, 21, 22, 23.

The transcript pages cited in this paragraph do not establish the facts that are alleged. Moreover, Defendant's factual allegations are contradicted by the same witnesses who allegedly offered this testimony. While Defendant claims that "[b]ased on her demonstrated skills, Plaintiff was brought to Dr. Bhandari's group go be a project manager for Rational IQ," Dr. Stettin testified specifically that he believed Plaintiff had "issues around project management…." (Exhibit 3, Stettin Depo. Tr. at 68).

Response to Defendant's Paragraph 26:   Denied.  See Material Facts, ¶¶ 17, 18, 19, 20, 21, 22, 23.

Response to Defendant's Paragraph 27:   Admitted that Plaintiff's title became Senior Director, Knowledge Solutions when she joined Mr. Bhandari's group.

Admitted that it is not unusual at Medco hire someone with a job description or an open and vacant position.  See Material Facts, ¶¶ 9, 16, 111.

Response to Defendant's Paragraph 28:   Admitted.  See Material Facts, ¶¶ 18, 19, 20, 21, 23.

Response to Defendant's Paragraph 29:   Denied.  See Material Facts, ¶ 25.

Response to Defendant's Paragraph 30:   Denied.

It is a disputed issue of fact whether "Plaintiff did well on strategy-related tasks while working for Dr. Bhandari's group." See Material Facts, ¶ 67.

It is a disputed issue of fact whether the "strategy-related tasks" associated with the Rational IQ service offering ended prior to October 2007.  There is no evidence in the record that even establishes which tasks Defendant considers "strategy-related."

It is a disputed issue of fact whether "Plaintiff's attempts to take Rational IQ to market were failing …." See Material Facts, ¶¶ 9, 10, 11, 12, 13, 14, 15, 76, 77.

It is a disputed issue of fact whether "Plaintiff needed daily coaching" while trying to take Rational IQ to market.  Defendant cited to a portion of the transcript that indicates Mr.

Bhandari had to coach Plaintiff during the phase of her job that she was doing "strategy-related tasks." (Exhibit 4, Bhandari Depo. Tr. at 92-93). Thus, the record does not support Defendant's contention. See Material Facts, ¶ 67.

In addition, there is no credible evidence that Mr. Bhandari provided Plaintiff with "daily coaching." Mr. Bhandari actually testified as follows:

> Q.    How frequently would you have to coach her during that phase?
>
> A.    I don't remember, but she needed coaching.
>
> Q.    Daily?
>
> A.    Oh, yes.
>
> Q.     You would coach her daily?
>
> A.    Yeah.  I mean, we would have e-mail interactions.  I'm sure we had daily e-mail interactions, if we did not speak on the phone.  (Exhibit 4, Bhandari Depo. Tr. at 93).

Yet, Defendant did not produce a single email (or any other document) that evidences Mr. Bhandari coached Plaintiff on a daily basis.

If such documents were actually created by Mr. Bhandari, Defendant had an obligation under its "Records Retention Schedule" to retain these documents for ten years after Plaintiff's (and Mr. Bhandari's) employment ceases.  According to the Records Retention Schedule:

> Employees' personnel records, including individual attendance records, wage and salary history, application forms, performance evaluations, termination papers, exit interview records, withholding information, garnishments, test results (individual), employment contracts, etc. – 10 years after employment ceases.  [Emphasis added]

No such documents were produced.

**Response to Defendant's Paragraph 31:**    Denied.

In the summer or fall of 2007, Plaintiff accompanied Sharon McCoy, a sales person, on sales call, even though this was not part of Plaintiff's job description or job duties. Plaintiff accompanied Ms. McCoy on this call because Mr. Stratton was not available. Although by this point in time, Mr. Bhandari and Plaintiff had agreed that Rational IQ would be marketed, and sold, as a service offering, Ms. McCoy continued to try to sell Rational IQ as a product. Ms. McCoy was not pleased with the sales presentation because Mr. Stratton was not there. While she might have blamed Plaintiff the real issue was that Rational IQ had serious limitations (especially as a product), which Plaintiff had discussed with Mr. Bhandari since she began reporting to him. Mr. Bhandari agreed that Rational IQ had limitations. Ms. McCoy told Mr. Bhandari that she thought Plaintiff was an ineffective sales person. Mr. Bhandari reported this to me. (Meyers Aff., ¶ 23).

Response to Defendant's Paragraph 32:    Denied.

Dr. Bhandari testified that Mr. Gerber believed that Plaintiff was "miscast" in a sales role – a role that Dr. Bhandari testified Plaintiff never occupied. Further, Mr. Gerber complemented Plaintiff's financial planning and analysis, mirroring Mr. Kornwasser's assessment that Plaintiff excelled in financial analysis. (Exhibit 4, Bhandari Depo. Tr. at 120-121).

Defendant failed to produce any contemporaneous evidence that corroborates Mr. Bhandari's testimony that Mr. Gerber gave Dr. Bhandari negative feedback on Plaintiff's presentations to AmeriGroup and Bluegrass. This allegation first appeared in Mr. Bhandari's November 2007 review of Plaintiff, which he wrote (at Dr. Stettin instruction) because "We need

you to write down your reasons as to why you think Amy is not fit for the job." See Material Facts, ¶¶ 62, 63, 64, 65, 66.  The document, however, actually focuses on why Mr. Bhandari does not believe Plaintiff "merit[s] a promotion." See Material Facts, ¶¶ 62, 63, 64, 65, 66.

The paragraph's implication – that Plaintiff was responsible for the failed Rational IQ platform – is undermined by the actual record.  See Material Facts, ¶¶ 9, 10, 11, 12, 13, 14, 15, 76, 77.

Response to Defendant's Paragraph 33:        Denied.

Dr. Bhandari testified that he did not agree with Plaintiff's rating of AmeriGroup, HealthNow, CBEBT, Calpers and NPDC AON as prospects.  (Exhibit 4, Bhandari Depo. Tr. at 124, 145, 148-153).

Contrary to Defendant's assertion, Dr. Bhandari only testified that some time was wasted trying to sell products to Calpers. (Exhibit 4, Bhandari Depo. Tr. at 124, 145, 148-153).  Dr. Bhandari, however, could not remember whether any of these companies actually purchased Rational IQ.  Further, Dr. Bhandari testified that he was involved in the rating process and initially approved of Plaintiff's allocation of resources.  (Exhibit 4, Bhandari Depo. Tr. at 124, 145, 148-153).

Defendant failed to produce any contemporaneous evidence that corroborates Mr. Bhandari's testimony that "Plaintiff erroneously rated AmeriGroup, HealthNet, CBEBT, Calpers, and NPDC Aon highly as potential customers for the Rational IQ product although they were not, thereby causing Medco unnecessarily to waste resources."  This allegation first

appeared in Mr. Bhandari's November 2007 review of Plaintiff, which he wrote (at Dr. Stettin instruction) because "We need you to write down your reasons as to why you think Amy is not fit for the job." <u>See</u> Material Facts, ¶¶ 62, 63, 64, 65, 66.  The document, however, actually focuses on why Mr. Bhandari does not believe Plaintiff "merit[s] a promotion." <u>See</u> Material Facts, ¶¶ 62, 63, 64, 65, 66.

The paragraph's implication – that Plaintiff was responsible for the failed Rational IQ platform – is undermined by the actual record.  <u>See</u> Material Facts, ¶¶ 9, 10, 11, 12, 13, 14, 15, 76, 77.


<u>Response to Defendant's Paragraph 34</u>:     Denied except to admit that the quote is accurate. <u>See</u> Material Facts, ¶¶ 28, 29, 30, 31, 32, 33, 34, 35.


<u>Response to Defendant's Paragraph 35</u>:     Denied.   <u>See</u> Plaintiff's Response to Defendant's Paragraph 34.


<u>Response to Defendant's Paragraph 36</u>:     Denied. <u>See</u> Material Facts, ¶¶ 28, 29, 30, 31, 32, 33, 34, 35.

The evidence establishes that Plaintiff's notes were sporadic.  In addition, Plaintiff testified that her notes state she "hinted at concerns" reflecting the fact she "thought [her disparate treatment from other senior managers] was because [she] was a female" (Meyers Depo. Tr. at 380-389).   Furthermore, Ms. Wolckenhauer admitted at her deposition that Plaintiff

complained of disparate treatment by Mr. Bhandari.   See Plaintiff's Response to Defendant's Paragraph 34.

Response to Defendant's Paragraph 37:      Denied.   See Plaintiff's Response to Defendant's Paragraph 34.

Response to Defendant's Paragraph 38:      Denied except to admit the quotations are accurate. See Response to Defendant's Paragraphs 34.

Response to Defendant's Paragraph 39:      Denied.

Plaintiff did not testify that she only "recalls one meeting, in the summer or fall of 2007, to which [she] was not invited."  Defendant's counsel engaged in the following exchange with Plaintiff:

> Q:    What specific meetings do you say Mr. Bhandari did not invite you to that he should have invited you to.
>
> A:    I don't know the breadth of them because I was not invited.
>
> Q:    How about one?  Was there any meeting that Mr. Bhandari did not invite you to that you say he should have?
>
> A:    Yes.
>
> Q:    Give me one.
>
> A:    It was a, um, member experience meeting.  (Meyers Depo. Tr. at 179).

Response to Defendant's Paragraph 40:      Denied.

Ms. McDermott testified that she met with Plaintiff "once or twice." (Exhibit 2, McDermott Depo. Tr. at 42). Ms. McDermott testified that she only recalled the specifics of one of the meetings. (Exhibit 2, McDermott Depo. Tr. at 42). Further, Ms. McDermott did not testify that Plaintiff did not complain that she was being discriminated against. Indeed, Ms. McDermott testified that Plaintiff's complaints were "about [Plaintiff]" and that Plaintiff was complaining that Dr. Bhandari was not just abrupt generally but abrupt to Plaintiff. (Exhibit 2, McDermott Depo. Tr. at 42) ("Q: [Dr. Bhandari was abrupt] to [Plaintiff] though correct? A: Correct...").

Response to Defendant's Paragraph 41:    Denied.

Defendant again misstates the record. Plaintiff testified that she did not know how Dr. Bhandari interacted with three specific women because he excluded Plaintiff from meetings with those women – women who did not report to Dr. Bhandari. (Meyers Depo. Tr. at 185).

However, Plaintiff was the only female who reported to Mr. Bhandari.

Response to Defendant's Paragraph 42:    Admitted, except that Plaintiff testified that Dr. Bhandari cut her off "orders of magnitude more" than her male colleagues. (Meyers Depo. Tr. at 178).

Response to Defendant's Paragraph 43:    Denied.

The evidence in this record does not establish that "Mr. Stratton also complained about Dr. Bhandari's abrupt manner."

<u>Response to Defendant's Paragraph 44</u>:      Admitted that Plaintiff attended a meeting with Mr. Bhandari on October 17, 2007.

Mr. Bhandari testified that prior to the October 17, 2007 meeting he had reached the conclusion that Plaintiff could not remain in her current role.  (Exhibit 4, Bhandari Depo. Tr. at 156)  Mr. Bhandari said that at the October 17, 2007 meeting he told Plaintiff that "she didn't fit the job.  And she, you know, she should look for something else." (Exhibit 4, Bhandari Depo. Tr. at 196)  Mr. Bhandari testified that "I did start helping her find a position in Medco outside my department after October 17[th]."  (Exhibit 4, Bhandari Depo. Tr. at 171) (Exhibit 13).

Defendant's contention in this paragraph that Mr. Bhandari "commended Plaintiff on her strategy" is contradicted by Mr. Bhandari's testimony that Plaintiff required "daily coaching" during the strategy phase.  <u>See</u> Plaintiff's Response to Defendant's Paragraph 30.   This inconsistency is evidence that Defendant's argument and Mr. Bhandari are not credible.

<u>Response to Defendant's Paragraph 45</u>:      Denied.

A disputed issue of fact exists whether "Dr. Bhandari previously had given a similar appraisal of Plaintiff's strengths and weaknesses to Dr. Stettin."  Defendant cannot point to a single piece of contemporaneous evidence to support Dr. Stettin's testimony concerning (1) Mr. Bhandari's analysis of Plaintiff's performance, and (2) the claim that Mr. Bhandari had previously given Dr. Stettin a similar appraisal of Plaintiff.   Further, Plaintiff received an exceptional annual performance review for 2007 – the same year in which Mr.. Bhandari purportedly complained about her execution.  <u>See</u> Material Facts, ¶¶ 73, 74, 75.

As discussed in Plaintiff's Response to Paragraphs 30 and 44, Mr. Bhandari testified that Plaintiff did not perform well on the "strategy tasks, undermining the credibility of Defendant's argument that Mr. Bhandari told Dr. Stettin he "commended Plaintiff on her strategy."

For the same reasons, a disputed issue of fact exists whether "Dr. Bhandari told Dr. Stettin that Plaintiff had been contributing as far as strategy, but not from the standpoint of execution and relationships with people in Medco's marketing groups."

Response to Defendant's Paragraph 46:      Admitted that Plaintiff was a "good strategist."

However, as discussed in Plaintiff's Response to Defendant's Paragraph 30, 44, and 45, Mr. Bhandari did not testify that be believed "Plaintiff was a good strategist." Rather, he said that Plaintiff required "daily coaching" during the strategy phase. This inconsistency is evidence that Defendant's argument and Mr. Bhandari are not credible.

Response to Defendant's Paragraph 47:      Denied.  See Material Facts, ¶¶ 37, 38, 39, 40, 41, 42, 43, 45, 46.

There is no competent evidence in the record that "[a]t the time, all strategic tasks in Dr. Bhandari's group had been completed." Furthermore, the sentence is intended to imply that Mr. Bhandari believed Plaintiff performed well on the "strategy tasks," notwithstanding his testimony that contradicts Defendant's argument.

Response to Defendant's Paragraph 48:      Denied.  See Material Fact, ¶ 36.

Defendant cites to a section of Plaintiff's deposition transcript where she testifies that "Q: [t]o your knowledge, did anyone tell Inderpal that you had gone to see Tara?   A: "**I don't know**." (Meyers Depo. Tr. at 157).  This testimony does not establish this fact.

In addition, a triable issue of fact exists regarding this assertion because Defendant misrepresented that Ms. Webber did not know Plaintiff filed her EEOC Charge of Discrimination before she instructed Ms. Wolckenhauer to send Plaintiff the March 26, 2009 letter.  Ms. Webber actually testified that she did in fact know the EEOC Charge had been filed before she instructed Ms. Wolckenhauer to send the letter.  See Material Fact, ¶¶ 104, 105.  Defendant's willingness to make this misrepresentation allows a fact finder to conclude that Defendant is also lying about Mr. Bhandari.


Response to Defendant's Paragraph 49:      Admitted that Mr. Bhandari sent an e-mail to Plaintiff alleging that he spoke with Lisa Ketner.

Admitted that Ms. Ketner was in Medco's Member Engagement Group under Mr. Kornwasser.

Denied that the record establishes that Mr. Bhandari thought that Plaintiff was capable of excelling in the Member Engagement Group.   See Plaintiff's Response to Defendant's Paragraphs 30, 44, and 45, citing to evidence in the record that Mr. Bhandari did not believe Plaintiff performed well on "strategy tasks."


Response to Defendant's Paragraph 50:      Admitted that the e-mail exchange occurred as described by Defendant.

Admitted that Mr. Kornwasser testified that Ms. Ketner notified Plaintiff that there were no positions available in the Member Engagement Group. Mr. Kornwasser further testified that Ms. Ketner would have consulted him prior to speaking with Plaintiff, but that he did not remember if the conversation took place, or what was said. Mr. Kornwasser did not testify that he told Ms. Ketner there were no positions available in his group. (Exhibit 6, Kornwasser Depo. Tr. at 9-10)[5]

Response to Defendant's Paragraph 51:     Admitted.

Response to Defendant's Paragraph 52:     Admitted that on October 24, 2007 Dr. Bhandari sent an e-mail to Plaintiff stating that he spoke to Ms. Ketner and is waiting for her to speak with Mr. Kornwasser. (Defendant's Exhibit D-29)

Admitted that Ms. Ketner told Plaintiff in or around October 2007 that there were no positions available within her group.

Response to Defendant's Paragraph 53:     Admitted that Dr. Bhandari's October 24, 2007 email to Plaintiff indicates that "I have mentioned to Glen [Stettin] that you would like to explore if there is an opportunity to work on strategy for his department as a whole."

Denied that "Dr. Bhandari encouraged Plaintiff to reach out to Dr. Stettin directly."

_____

[5] Defendant appeared to enter a typo for the citation concerning Mr. Kornwasser's testimony on this point – referring to and attaching page 19 of his testimony instead of the prior citation, page 9.

<u>Response to Defendant's Paragraph 54</u>:       Denied.  <u>See</u> Material Facts, ¶¶ 49, 50, 51.

<u>Response to Defendant's Paragraph 55</u>:       Admitted that on October 26, 2007 Plaintiff spoke with Dr. Stettin about, among other things, her meeting with Dr. Bhandari the previous day.  <u>See</u> Material Facts, ¶ 57.

Denied that the record establishes that "Dr. Stettin responded to Plaintiff that he would speak to Medco's Human Resources group and work on finding Plaintiff a position."  Dr. Stettin did not offer any testimony regarding this.  Plaintiff testified Dr. Stettin "waffled" during their conversation and alluded to speaking with Human Resources.  (Meyers Depo. Tr. at 195-196).  Plaintiff testified that Dr. Stettin did not believe her concerning Dr. Bhandari's actions.  (Meyers Depo. Tr. at 195-196).

<u>Response to Defendant's Paragraph 56</u>:       Denied. <u>See</u> Material Facts, ¶¶ 48.

The evidence in the record from Dr. Stettin is that he did not know Plaintiff complained to Human Resources about the manner in which Mr. Bhandari spoke to her or that he excluded her from meetings.  (Exhibit 3, Stettin Depo. Tr. at 121-22).  Dr. Stettin said that he did remember speaking to Human Resources about Plaintiff during this time period.  (Exhibit 3, Stettin Depo. Tr. at 129-30).

Ms. Wolckenhauer testified that during this time period she spoke with Dr. Stettin regarding the issues surrounding Plaintiff.  (Exhibit 1, Wolckenhauer Depo. Tr. at 48-49; 88-89; 91; 92; 108-09; 160).  While Ms. Wolckenhauer claimed that she could not remember exactly when these discussions took place (other than fall of 2007) or precisely what was discussed

(other than issues concerning Plaintiff), her testimony establishes that Dr. Stettin was in regular communication with Human Resources during this period, making it unlikely that Ms. Wolckenhauer did not tell him that Plaintiff had met with her.

Response to Defendant's Paragraph 57:     Denied.  See Material Facts, ¶ 60.

Response to Defendant's Paragraph 58:     Admitted that Ms. Accetta held the position Product Owner for the Rational Med and Optimal Health products.   Admitted that Defendant's description of Ms. Accetta's testimony is accurate concerning the function of these products.

Response to Defendant's Paragraph 59:     Admitted that the quotation is accurate.

Response to Defendant's Paragraph 60:     Admitted.

Response to Defendant's Paragraph 61:     Admitted that there was not an open position in Ms. Accetta's group at the time.  Mr. Bradbury testified that there was a "need" because there were "deliverables that were important for us to get done."  (Exhibit 8, Bradbury Depo. Tr. at 22-23) See Material Facts, ¶ 60.

   Admitted that Plaintiff was qualified for the position in Ms. Accetta's group.

Response to Defendant's Paragraph 62:     Denied.  See Material Facts, ¶¶ 57, 58, 60.

Response to Defendant's Paragraph 63:        Denied.

Defendant's own internal documents establish that Defendant did not transfer Plaintiff into Ms. Accetta's group before November 20, 2007.  (Exhibit 15).


Response to Defendant's Paragraph 64:        Denied.

Defendant did not cite to any credible evidence that Ms. Accetta had many more responsibilities than Plaintiff despite sharing the same title as Plaintiff.


Response to Defendant's Paragraph 65:        Admitted.


Response to Defendant's Paragraph 66:        Denied.

The evidence cited by Defendant establishes the Plaintiff raised concerns that her position reporting to Ms. Accetta had less responsibilities and no opportunities for advancement.


Response to Defendant's Paragraph 67:        Denied that the email says what Defendant's claim.


Response to Defendant's Paragraph 68:        Denied that "[t]here was an extensive list of projects for Plaintiff in Ms. Accetta's group."

Admitted that Plaintiff and Ms. Accetta discussed projects.

The evidence in the record does not establish that Ms. Accetta "believed the projects assigned to Plaintiff would last for more than one year."  Ms. Accetta testified that she didn't

"have a crystal ball as to how long each one of [the projects] would last." (Exhibit 5, Accetta Depo. Tr. at 65)

Response to Defendant's Paragraph 69:        Denied. See Material Facts, ¶¶ 73, 74, 75, 78.

In addition, there is no contemporaneous evidence that Ms. Accetta actually believed the criticisms set forth in this paragraph.

Response to Defendant's Paragraph 70:        Admitted that when Plaintiff moved into both Mr. Bhandari's and Ms. Accetta's group there was not a vacant position, which was common at Medco.

Admitted that on or around November 20, 2007, Plaintiff suggested to Ms. Accetta that her title should be "Senior Director, Strategy and Market Development, Care Enhancement Solutions." Admitted that Ms. Accetta agreed to this title.

Response to Defendant's Paragraph 71:        Denied.

Defendant cites to Dr. Stettin's deposition to establish that "it was not out of the ordinary for an employee in Dr. Stettin's organization to decide his or her title with the input of their manager." However, Dr. Stettin did not say this at his deposition. In response to the question "In your group is it normally that an employee and her direct manager, who in this case is at Ms. Accetta's level, would just decide on their own what a person's title should be," Dr. Stettin testified that it "I would say it probably isn't necessarily usual but it happens." (Exhibit 3, Stettin Depo. Tr. at 163)

Response to Defendant's Paragraph 72:  Denied.  See Material Facts, ¶¶ 9, 10, 11, 12, 13, 14, 15, 76, 77.

Response to Defendant's Paragraph 73:  Admitted.

Response to Defendant's Paragraph 74:  Denied.  See Material Facts, ¶ 72.

Response to Defendant's Paragraph 75:  Denied. See Material Facts, ¶ 72.

Response to Defendant's Paragraph 76:  Admitted that Ms. Accetta conducted Plaintiff's 2007 and 2008 performance reviews, but Ms. Accetta testified that for 2007 she spoke with the people Plaintiff worked with in order to conduct this review.  See Material Facts, ¶¶ 73, 74, 75, 78.

Response to Defendant's Paragraph 77:  Admitted that Ms. Accetta's comments concerning Plaintiff's performance for 2007 were positive.  See Material Facts, ¶¶ 73, 74, 75.

Response to Defendant's Paragraph 78:  Admitted that there is no negative feedback from Dr. Bhandari on Plaintiff's 2007 performance review. See Material Facts, ¶¶ 73, 74, 75, 78.

Response to Defendant's Paragraph 79:  Admitted.  See Material Facts, ¶¶ 73, 74, 75.

Response to Defendant's Paragraph 80:    Admitted that Dr. Stettin approved Plaintiff's 2007 performance review and bonus.  Denied that he did not participate in the review; Defendant admits that he approved the review.

Response to Defendant's Paragraph 81:    Admitted.

Response to Defendant's Paragraph 82:    Denied.

The evidence in the record establishes that Plaintiff was working full-time hours.  The evidence in the record does not establish that the projects were "of a tactical nature."

Response to Defendant's Paragraph 83:    Admitted that Plaintiff was a witness in litigation between Medco and IMS Health.  Plaintiff testified that her time spent on this litigation varied from month to month and was generally between 10 and 60% of her time.  (Meyers Depo. Tr. at 240)

Response to Defendant's Paragraph 84:    Admitted except to deny that Plaintiff testified on August 23, 2008 during arbitration hearings.  Plaintiff stated that she testified during the arbitration hearings sometime on or around September 23, 2008 – the start date for the arbitration.  (Meyers Depo. Tr. at 242-243) (Exhibit 38).

Response to Defendant's Paragraph 85:    Denied.

The evidence in this record does not establish that Dr. Stettin "did not know of the IMS litigation in October 2007." Defendant cited to a portion of the transcript that does not establish this fact. Dr. Stettin testified, "I am familiar with it." (Exhibit 3, Stettin Depo. Tr. at 132). Because he used the present tense in his answer, it is not clear whether Dr. Stettin meant he was familiar with it at the deposition or if he was familiar with it in October 2007. But he did not say he did not know about it.

Response to Defendant's Paragraph 86:     Admitted.

Response to Defendant's Paragraph 87:     Admitted that Ms. Accetta praised Plaintiff during her mid-year performance review for 2008.

Denied that the evidence establishes that "Ms. Accetta recognized at this performance review that there was little strategic work for Plaintiff to perform ...." See Material Facts, ¶¶ 73, 74, 75.

Response to Defendant's Paragraph 88:     Denied.

The evidence cited by Defendant does not establish that "Plaintiff asked Ms. Accetta to place her on a downsizing list." There is no reference to a "downsizing list" on page 77 of Ms. Accetta's deposition.

Response to Defendant's Paragraph 89:     Denied.

It is a disputed issue of fact whether the allegations in this paragraph are true and accurate.

Response to Defendant's Paragraph 90:   Denied.  See Material Facts, ¶¶ 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90.

Response to Defendant's Paragraph 91:   Denied.  See Material Facts, ¶¶ 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90.

Response to Defendant's Paragraph 92:   Denied that "Plaintiff's performance was not a factor in the decision to eliminate her position."

Admitted that "Plaintiff was a valuable contributor to Ms. Accetta's team in 2008."

Response to Defendant's Paragraph 93:   Denied.

It is a disputed issue of fact whether Mr. Bhandari "play[ed] a role in the decision to terminate Plaintiff's employment in about December 2008."  See Material Facts, ¶¶ 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90.

In addition, Mr. Bhandari played a critical role in the termination decision because he removed her from a permanent position in his group in October 2007.  But for this decision, Plaintiff would not have been in the one position in Dr. Stettin's entire group that was eliminated as a result of this alleged "economic downsizing."  See Material Facts, ¶¶ 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90.

It is a disputed issue of fact whether Ms. Wolckenhauer "was not involved in the decision to terminate Plaintiff's employment." <u>See</u> Material Facts, ¶¶ 33, 34, 35.   Thus, Ms. Wolckenhauer was involved in the termination decision by perpetuating Plaintiff's untruthful, negative, and stereotypical reputation.

<u>Response to Defendant's Paragraph 94</u>:        Admitted.

<u>Response to Defendant's Paragraph 95</u>:        Denied.

While Defendant claims it did not replace Plaintiff in Ms. Accetta's group (which was not necessary because this position was created to house Plaintiff in the wake of Mr. Bhandari's retaliatory conduct), Mr. Bradbury testified that during this time period his group was in the midst of approximately 25% growth. <u>See</u> Material Facts, ¶ 83.

<u>Response to Defendant's Paragraph 96</u>:        Admitted that Mr. Bradbury terminated Plaintiff's employment on January 8, 2009 and that Plaintiff was presented with a termination letter and a standard form severance plan package

<u>Response to Defendant's Paragraph 97</u>:        Admitted that the selected passages referred to in this paragraph are contained within the letter.

<u>Response to Defendant's Paragraph 98</u>:        Denied.   <u>See</u> Material Facts, ¶¶ 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101.

Response to Defendant's Paragraph 99:      Denied.

According to the January 8, 2009 letter, the offer of severance pay and benefits in exchange for signing a release of all claims was valid for 45 days. (Exhibit 19).

Response to Defendant's Paragraph 100:     Admitted that Plaintiff was denied access to her telephone contacts and computerized calendar.

Denied that Plaintiff's personal telephone contacts and personal calendar constitute information protected by the Key Employee Agreement.

Response to Defendant's Paragraph 101:     Admitted that Defendant initially withheld more information than it was entitled to under the Key Employee Agreement.  Further admitted that Defendant eventually released some information which Plaintiff should not have been denied access to.

Response to Defendant's Paragraph 102:     Admitted.

Response to Defendant's Paragraph 103:     Denied.

Plaintiff testified she did not know the specific qualifications for each title and grade number. (Meyers Depo. Tr. at 270).  It is therefore not possible that Plaintiff told Mr. Bradbury that she should be replaced with "two grade-five positions."

<u>Response to Defendant's Paragraph 104</u>:      Admitted.

<u>Response to Defendant's Paragraph 105</u>:      Admitted that Plaintiff did not sign the release of claims.

<u>Response to Defendant's Paragraph 106</u>:      Admitted that Plaintiff utilized the out-placement counselor.

<u>Response to Defendant's Paragraph 107</u>:      Denied. <u>See</u> Material Facts, ¶¶ 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108.

<u>Response to Defendant's Paragraph 108</u>:      Denied. <u>See</u> Material Facts, ¶¶ 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108.

<u>Response to Defendant's Paragraph 109</u>:      Admitted except to deny that Defendant's payment of Plaintiff's 2008 bonus was erroneous. .

<u>Response to Defendant's Paragraph 110</u>:      Denied.

A disputed issue of fact exists whether Mr. Bhandari hired Elaine Koski "to bring Rational IQ to market." <u>See</u> Material Facts, ¶¶ 9, 10, 11, 12, 13, 14, 15, 76, 77.

<u>Response to Defendant's Paragraph 111</u>:     Admitted.

<u>Response to Defendant's Paragraph 112</u>:     Admitted that the text of the e-mail is accurately quoted.

<u>Response to Defendant's Paragraph 113</u>:     Admitted that the e-mail is accurately quoted.

<u>Response to Defendant's Paragraph 114</u>:     Admitted that the e-mail is accurately quoted.

<u>Response to Defendant's Paragraph 115</u>:     Denied except to admit the quotation is accurate.

Plaintiff testified that "[Dr. Bhandari] didn't say it in the same words.  He said I couldn't get anything done.  That's very different in my mind from a project management tracking details, executional...role." (Meyers Depo. Tr. at 455).

<u>Response to Defendant's Paragraph 116</u>:     Admitted.

<u>Response to Defendant's Paragraph 117</u>:     Denied.

The evidence establishes that, when Mr. Kornwasser called Plaintiff on February 14, 2011, he "was not aware that Ms. Meyers' lawsuit is ongoing." (Exhibit 22).    Accordingly, Defendant's contention that he "saw nothing wrong about communicating with Plaintiff during this litigation ..." is not credible.

Response to Defendant's Paragraph 118:     Denied.

      The evidence in the record establishes that Mr. Kornwasser called Plaintiff "about the possibility of some consulting services [for Medco]." (Exhibit 22).


Response to Defendant's Paragraph 119:     Denied except that the quote is accurate.

      Mr. Kornwasser's testimony reflects the fact that he believed a consultant was needed but that Defendant had not formally added headcount to the group yet – similar to the manner in which Plaintiff's position reporting to both Mr. Bhandari and Ms. Accetta was created.


Response to Defendant's Paragraph 120:     Denied except that the quote is accurate.   See Response to Defendant's Paragraphs 117-119.


Response to Defendant's Paragraph 121:     Admitted that the conversation ended prior to Plaintiff receiving the opportunity to express interest in the position because "when [Plaintiff] advised [Mr. Kornwasser] [that her discrimination and retaliation claims were still pending] he ceased any conversation on that subject …." (Exhibit 22).


Response to Defendant's Paragraph 122:     Denied.

      Mr. Kornwasser testified that he did not speak with anyone else about having a discussion **with Plaintiff** concerning the consulting position, not that he did not speak with anyone at Medco concerning the position. (Exhibit 6, Kornwasser Depo. Tr. at 82-84).

<u>Response to Defendant's Paragraph 123</u>:   Denied.   <u>See</u> Response to Defendant's Paragraphs 117-123.


Dated: New York, New York
       June 27, 2011

                                    LIDDLE & ROBINSON, L.L.P.


                                    By:_____
                                         David Marek
                                         Matthew J. McDonald
                                    800 Third Avenue
                                    New York, New York 10022
                                    (212) 687-8500

                                    *Attorneys for Plaintiff*