USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/04/2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————

AMY MEYERS,                                    :
                                               :
                                               :
                Plaintiff,                     :
                                               :        Before: Richard K. Eaton, Judge[*]
        v.                                     :
                                               :        Court No. 09 Civ. 09216 (RKE)
MEDCO HEALTH SOLUTIONS, INC.                   :
                                               :
                                               :
                Defendant.                     :
                                               :
————————————————————

OPINION AND ORDER

This case involves claims by plaintiff Amy Meyers ("plaintiff" or "Meyers") against her

former employer, Medco Health Solutions, Inc. ("defendant" or "Medco"), under the New Jersey

Law Against Discrimination ("NJLAD"), the New York State Human Rights Law ("NYSHRL"),

and Title VII of the Civil Rights Act of 1964 ("Title VII"), alleging that she was unlawfully

terminated by Medco in retaliation for her complaints about her supervisor's gender

discrimination. In addition, plaintiff asserts claims of unlawful retaliation under the NJLAD,

NYSHRL, and Title VII, arising out of Medco's alleged refusal to rehire her because she brought

this action.[1]

_____

[*]     Judge Richard K. Eaton, of the United States Court of International Trade, sitting
by designation.

[1]     There are nine counts in plaintiff's complaint. Counts One, Three, and Five assert
that plaintiff was discriminated against on the basis of her gender in violation of the NJLAD,
NYSHRL, and Title VII, respectively. At oral argument, plaintiff's counsel confirmed that
Meyers' claim was based on her termination, which was an act of allegedly unlawful retaliation,
not discrimination. Thus, plaintiff has abandoned the claims found in Counts One, Three, and
Five. Counts Two, Four, and Six claim that plaintiff was the subject of unlawful retaliation
under the NJLAD, NYSHRL, and Title VII, respectively, as a result of her complaints about
gender discrimination. Counts Seven, Eight, and Nine assert claims under the NJLAD,

Defendant has counterclaimed for unjust enrichment, seeking the return of $21,756.96, which it maintains was mistakenly paid to plaintiff as the post-taxes net of a $40,000.00 severance bonus. According to Medco, retention of that bonus was contingent upon plaintiff executing a release of future claims, which she did not sign.

Defendant has moved for summary judgment on all of plaintiff's claims and on its counterclaim.

BACKGROUND[2]

Meyers worked at Medco from April 2004 through January 2009, during which time the company was located in Franklin Lakes, New Jersey. She began her career at Medco as a Director, Corporate Strategy and Business Development, and around early 2005 she became a Senior Director. Def.'s Local Rule 56.1 Statement ¶¶ 1, 6 (ECF Dkt. No. 43) ("Def.'s 56.1 Stmt."). In early 2007, Meyers was transferred to the position of Senior Director, Strategy and Market Development, Knowledge Solutions. Def.'s 56.1 Stmt. ¶¶ 16, 27; Meyers Dep. 54:16–55:24. Her immediate supervisor at that time was the group's Vice President Inderpal Bhandari ("Bhandari"). Def.'s 56.1 Stmt. ¶ 16. The decision to hire Meyers into this group was made by Bhandari, with the approval of his supervisor, Dr. Glen Stettin ("Stettin"). Def.'s 56.1 Stmt. ¶ 21; Bhandari Dep. 36:22–37:7; see Stettin Dep. 66. Although Stettin was aware of previous reports that plaintiff's performance was unsatisfactory while working in the Business

---

NYSHRL, and Title VII, respectively, for failure to rehire plaintiff in retaliation to her filing this lawsuit.

[2]     The court has taken the facts described below from the parties' Rule 56.1 statements. Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact, or the opposing has offered no admissible evidence to controvert a statement which is otherwise supported by evidence on the record. Where no Rule 56.1 statement dealt directly with a fact, a citation to an uncontroverted portion of the record is provided.

Development Group, he believed that plaintiff was bright and dedicated, and felt "she deserv[ed] another chance" at Medco. Def.'s 56.1 Stmt. ¶ 22; Stettin Dep. 67:25–68:12; 71:7–10. Bhandari was also aware of assertions of performance issues, but through conversations with plaintiff, he was of the impression that she was intelligent and a hard worker. Def.'s 56.1 Stmt. ¶¶ 23–24; Bhandari Dep. 36:6–21; 39:3–40:1. During the time she worked for Bhandari, Meyers worked at least one day a week from her home in New York. Pl.'s Local Rule 56.1 Statement ¶ 25 (ECF Dkt. No. 50) ("Pl.s' 56.1 Stmt."); *see* Meyers Dep. 194:10–12.

Meyers was the only woman who reported to Bhandari during her time in his group. Pl.s' 56.1 Stmt. ¶ 26; Meyer Aff. ¶ 18. During her tenure with Bhandari's group, at least two of Meyers' co-workers, Rich Gerber and Sharon McCoy, complained about her presentations to customers. Def.'s 56.1 Stmt. ¶¶ 31–32; Bhandari Dep. 116:13–23, 120:8–122:5. Sharon McCoy, a salesperson in Medco's Healthcare Group, asked that plaintiff not have any further involvement with her customer accounts. Def.'s 56.1 Stmt. ¶ 31; Bhadari Dep. 115:18–118:12; Meyers Dep. 97:9–100:22.

In October 2007, Meyers approached Tara Wolckenhauer ("Wolckenhauer"), a Medco Human Resources Representative, to discuss Medco's mid-year performance review process and career development. Def.'s 56.1 Stmt. ¶ 34. During this conversation, Meyers alleges that she complained about the way that Bhandari had treated her. Specifically, Meyers "told Ms. Wolckenhauer that Mr. Bhandari spoke to [her] in a disrespectful, and belittling, manner, and that he cut [her] off whenever [she] spoke, and that he did this in front of [her] colleagues. . . . [Meyers] also complained that Mr. Bhandari excluded [her] from meetings and took [her] male colleagues in [her] place." Pl.s' 56.1 Stmt. ¶ 29; Meyers Aff. ¶ 19. According to Meyers, she

3

informed Wolckenhauer that "I think [Bhandari] deals with me differently because I'm a woman." Meyers Dep. 156:1–3.

On October 17, 2007, days after the meeting with Wolckenhauer, Bhandari conducted a mid-year performance review with Meyers. Pl.s' 56.1 Stmt. ¶ 37. Bhandari's assessment of Meyers' performance was mixed. He provided her with positive comments on her strategy development skills, but gave her negative reviews concerning her sales skills and her understanding of relevant business models. Def.'s 56.1 Stmt. ¶ 44; Meyers Dep. 113:15–117:17; 126:1–127:24. During this meeting, Bhandari suggested to Meyers that she should look for opportunities with other groups within Medco. Pl.s' 56.1 Stmt. ¶ 37; Meyers Dep. 130:8–131:1. On October 25, 2007, Bhandari informed Meyers that neither he nor Laizer Kornwasser ("Kornwasser"), leader of Corporate Strategy and Business Development, had a position for her within their respective groups. Def.'s 56.1 Stmt. ¶ 54; Meyers Dep. 192:24–193:5. Based on a follow-up conversation with Bhandari, Meyers believed that she had been fired. *See* Meyers Dep. 191:3–193:5.

On October 26, 2007, Meyers, while working from home, contacted Stettin about her conversations with Bhandari. Def.'s 56.1 Stmt. ¶ 55; Meyers Dep. 194:1–195:6. Stettin assured Meyers that she had not been fired and instructed her to begin reporting to Lucille Accetta ("Accetta"), another Senior Director, even though Accetta did not have an open position. Def.'s 56.1 Stmt. ¶¶ 59–60; Meyers Dep. 196:18–19:247, 216:14–217:18; Accetta Dep. 37:14–37:22. According to Meyers, no one explained what her actual role would be in Accetta's group. Pl.s' 56.1 Stmt. ¶ 60; Meyers Dep. 217:12–217:18.

In her new position, Meyers worked from home at least two days a week and shared an office with a colleague. Pl.s' 56.1 Stmt. ¶ 72; Accetta Dep. 52:25–53:16. Meyers' year-end

review for 2007 was conducted by Accetta on or about March 31, 2008.  Def.'s 56.1 Stmt. ¶ 74;
Meyers Dep. 228:12–229:16.  Meyers received a satisfactory rating and, as a result, was given a
pay raise and a $40,000 bonus, among other benefits.  Def.'s 56.1 Stmt. ¶ 81.

During 2007 and 2008, Meyers was a witness in a multi-million dollar lawsuit against
Medco brought by IMS Health, Inc. (the "IMS Lawsuit").  Meyers worked closely with Medco's
lawyers by providing background information and giving deposition and direct testimony.
Meyers' role in the IMS Lawsuit was completed by the end of September 2008.  Def.'s 56.1
Stmt. ¶ 83–84; Meyers Dep. 240:5–243:17.  Meyers continued to work in Accetta's group until
January 2009, when she was informed that Medco was eliminating her position as a cost-saving
measure.  Pl.s' 56.1 Stmt. ¶ 91; Meyers Dep. 267:11–269:12.  She was therefore terminated.

On February 23, 2009, Meyers filed an Equal Employment Opportunity Commission
("EEOC") Charge of Discrimination, claiming that her termination was either an act of gender
discrimination or in retaliation to her complaints of gender discrimination.  On March 6, 2009,
Meyers was paid a bonus in the amount of $21,756.96.  On March 26, 2009, Medco demanded
the return of this bonus, claiming that it was dispersed in error, as it was intended to be paid in
consideration for Meyers signing a waiver and release pursuant to her severance package.  Def.'s
56.1 Stmt. ¶¶ 107–08; Wolckenhauer Dep. 246:13–247:9.  Meyers commenced this action on
November 5, 2009.

In addition to her retaliation claims relating to her termination, Meyers alleges that
Medco further retaliated against her based on her claims of gender discrimination by not rehiring
her.  Following her termination, Meyers and Kornwasser spoke periodically.  During these
interactions, it was common for them to discuss Meyers' job search, and Kornwasser agreed to
provide a reference for Meyers.  Def.'s 56.1 Stmt. ¶ 116; Kornwasser Dep. 69:22–72:21.  In

5

February 2011, Kornwasser called plaintiff to discuss a potential position for her at Medco. According to plaintiff, Kornwasser was unaware of this lawsuit, and did not discuss the potential position he had in mind for plaintiff with anyone at Medco. Pl.s' 56.1 Stmt. ¶ 112; *see* Kornwasser Dep. 79:8–81:15, 83:19–22; 89:8–11. As Kornwasser describes the conversation, he "called [Meyers] about an idea. At that time there was no opportunity. If she was interested in the idea, I was going to see if there was an opportunity." Def.'s 56.1 Stmt. ¶¶ 118–20; Kornwasser Dep. 89:4–89:7. Meyers alleges that Kornwasser discontinued discussing potential employment with her once he learned of the lawsuit. Pl.s' 56.1 Stmt. ¶ 112–13. She further alleges that Kornwasser told her to let him know when the lawsuit "gets closed out," at which time he would try to pursue this potential opportunity for her at Medco. Pl.s' 56.1 Stmt. ¶ 113.

Defendant has moved for summary judgment on plaintiff's claims on the following grounds: (1) that plaintiff claims are not within the scope of the NYSHRL because the alleged unlawful retaliatory conduct complained of occurred at Medco's offices in New Jersey; (2) that plaintiff's claims under the NJLAD and Title VII are barred by the applicable statute of limitations; (3) that plaintiff's retaliation-based claims fail as a matter of law because there is no competent record evidence that plaintiff was dismissed in response to her complaints of gender discrimination; and (4) that plaintiff's failure-to-rehire claims fail as a matter of law because it is undisputed that there was no open and vacant position at Medco to which the plaintiff applied.

Medco also moves for summary judgment on its unjust enrichment claim, arguing that plaintiff's bonus was conditioned upon the execution of a release, which plaintiff never signed.

DISCUSSION

I.    Summary Judgment Standard

A party is entitled to summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is

material if it might affect the outcome of the suit under the governing law, and an issue of fact is

genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting

*Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 94

(2d Cir. 2012)). In resolving a summary judgment motion, the court must construe "the evidence

in the light most favorable to the non-moving party and draw[] all reasonable inferences in [that

party's] favor." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

In opposing the motion for summary judgment, the non-moving party must identify

probative evidence on the record from which a reasonable fact-finder could find in its favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986). To avoid summary judgment, the

non-moving must make a showing of sufficient evidence of a "claimed factual dispute as to

require a judge or jury's resolution of the parties' differing versions of the truth." *See Senno v.*

*Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) (citation omitted).

The Supreme Court has "reiterated that trial courts should not 'treat discrimination

differently from other ultimate questions of fact.'" *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 148 (2000) (citation omitted). "It is now beyond cavil that summary judgment

may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v.*

*Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Accordingly, "summary judgment

7

remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994) (citations omitted).

II.     The NYSHRL Does Not Apply to Plaintiff's Claims

Defendant argues that the NYSHRL does not apply because the challenged conduct was undertaken by a foreign corporation outside of New York, and none of the acts complained of originated in New York.  For defendant, the fact that plaintiff was a New York resident does not establish a sufficient nexus between the alleged discriminatory conduct and New York to warrant application of the NYSHRL.

Plaintiff counters that the evidence establishes that defendant's conduct "affected the 'terms, conditions, or privileges of [her] employment' within New York," and therefore is covered by the NYSHRL.  Memorandum of Law in Opposition 49 (ECF Dkt. No. 49) ("Pl.'s Br.").  Meyers's position is based on her having worked from her home in New York on a regular basis, especially during the time she worked under Accetta.  Pl.'s Br. 4.

In order for discrimination to occur within New York for purposes of the NYSHRL it must be shown that the "unlawful discriminatory practice originated within New York state, that a discriminatory practice affected the 'terms, conditions, or privileges of [plaintiff's] employment' within New York, or that [defendant] retaliated against [plaintiff] because she complained about such discriminatory practices."  *See Sherwood v. Olin Corp.*, 772 F. Supp. 1418, 1426 (S.D.N.Y. 1991) (citations omitted).

This standard has not been met here. Plaintiff was employed in New Jersey, and the acts she complains of were all performed by employees of Medco, a foreign corporation,[3] in New Jersey. The mere fact that plaintiff resided in New York, and may have periodically worked from home, is not sufficient to warrant the application of New York law. None of the discriminatory acts complained of were committed in New York. Rather, they were allegedly committed by Medco's management at the company's Franklin Lakes, New Jersey facility and plaintiff's claimed complaints about these acts were made in New Jersey. In addition, her employment was terminated in New Jersey. Similarly, to the extent that plaintiff was offered a position in early 2009, it was offered by Kornwasser from New Jersey, plaintiff would have reported to work in New Jersey, and the decision ultimately not to offer that position to plaintiff would have been made in New Jersey. *See Sorrentino v. Citicorp*, 755 N.Y.S.2d 78, 79 (N.Y. App. Div. 2003) ("[The NYSHRL] does not provide a private cause of action to New York residents discriminated against outside of New York by foreign corporations. Defendants are concededly foreign corporations, and there is no evidence tending to show that they committed discriminatory acts against plaintiff in New York.") (citations omitted). Accordingly, because the NYSHRL is inapplicable to plaintiff's claims in this case, Counts Four, Five, and Eight of the Third Amended Complaint fail as a matter of law.

III.   Plaintiff's Claims Under the NJLAD and Title VII Are Not Time-Barred

Defendant contends that plaintiff's gender discrimination claims, based on events arising on or before October 2007, are barred by the statute of limitations applicable under the NJLAD

---

[3]   If Medco were a New York corporation, it would be subject to the NYSHRL regardless of where the alleged acts of discrimination or retaliation had taken place because of Meyers' New York residency. *See Hoffman v. Parade Publ'ns*, 933 N.E.2d 744, 748 (N.Y. 2010).

and Title VII, respectively. NJLAD claims are subject to a two-year statute of limitations. *Ali v. Rutgers*, 765 A.2d 714, 716 (N.J. 2000). In a "deferral" state, such as New Jersey, Title VII claims are subject to a three hundred-day limitations period. *See* 42 U.S.C. § 2000-5(e)(1) (2006); 29 C.F.R. § 1601.13 (2010).[4]

Plaintiff asserts that the adverse action she suffered was her termination, which occurred in January 2009. Since she filed her case in November 2009, plaintiff insists it is timely.[5]

The court finds that plaintiff's NJLAD and Title VII claims were timely filed. The relief sought is based on plaintiff's alleged wrongful termination in retaliation for her complaints concerning Bhandari's gender discrimination, not the acts that led to the discrimination complaint. This termination took place in January 2009, which was well within the limitations period. The conduct complained of from October 2007 onward constitutes the necessary predicate for allegations of retaliation for plaintiff reporting alleged gender discrimination prior to her termination. The essence of plaintiff's claim is that she was discriminated against in retaliation for her complaints about Bhandari's alleged discrimination, which ultimately

---

[4]    "Deferral States" are those states that have their "own age discrimination law and [their] own age discrimination remedial agency." *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 562 (2d Cir. 2006), *aff'd*, 552 U.S. 389 (2008). New Jersey is considered a "deferral" state for purposes of determining the length of the EEOC charging period. *Parikh v. UPS*, No. 11-4482, 2012 WL 3186478, at *2 (3d Cir. Aug. 7, 2012).

[5]    Plaintiff also argues that defendant waived its limitations defenses because they are affirmative defenses that were not raised in the answer to the original complaint or the first and second amended complaints. Defendant, however, responded to the Third Amended Complaint by filing a motion for summary judgment. It was, thus, appropriate for this affirmative defense to be raised for the first time in a motion served in lieu of a responsive pleading. Moreover, there is no indication that plaintiff was prejudiced by defendant's failure to raise this defense at an earlier point. This lack of prejudice counsels against waiver of the affirmative defense. *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (finding that an untimely pled affirmative defense could still be raised "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings").

culminated in her wrongful termination. "[T]he statute [does not] bar an employee from using prior acts as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Accordingly, because plaintiff's alleged injury was caused by her termination, the statute of limitations ran from the date of her termination, and her claims were, therefore, timely filed.

IV.   Plaintiff's Claims of Unlawful Retaliation Under NJLAD and Title VII Arising From Termination

A. Legal Framework

Plaintiff maintains that her employment at Medco was terminated in retaliation for her complaints about Bhandari's gender motivated discrimination.[6]  As noted, plaintiff has timely asserted this claim under the NJLAD and Title VII.

Under both statutes, plaintiff's claims are governed by the burden shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Mogull v. CB Commercial Real Estate Grp., Inc.*, 744 A.2d 1186, 1193 (N.J. 2000). Thus, to prove her claims, plaintiff bears the initial burden of establishing a prima facie case of discriminatory retaliation by showing that (1) she participated in a protected activity; (2) which

---

[6]      During oral argument, plaintiff's counsel clarified that plaintiff's claim was premised on her alleged wrongful termination, which, she maintains, was undertaken in retaliation to her complaints about Bhandari's treatment of her.  Plaintiff has thus abandoned her claim that she was discriminated against on account of her gender.

This is likely because the facts of this case would not support a finding of gender discrimination.  While plaintiff was removed from Bhandari's group at his behest, she was also originally hired by Bhandari into his group just eight months earlier.  As the Second Circuit noted, "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent. Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  Furthermore, plaintiff's position in Bhandari's group was eventually filled by Elaine Koski, another woman.

was known to the employer; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

If plaintiff meets this burden, it creates a presumption of unlawful retaliation that may be rebutted by "articulating a legitimate, non-discriminatory reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citations omitted). Once such reasons are presented, plaintiff bears the burden of producing "sufficient evidence to support a rational finding" that defendant's proffered reasons are pretextual. *Id.* The evidence required to meet this burden is that which, "taken as a whole, supports a sufficient rational inference of discrimination." *Id.*

## B. Plaintiff Has Established a Prima Facie Claim That She Was Terminated Because of Unlawful Retaliation

Defendant argues that Counts Two and Six[7] should be dismissed as a matter of law because the record contains undisputed evidence that: (1) plaintiff did not engage in a protected activity for which she was retaliated against; and (2) even if she did engage in such activity, there is no causal connection between plaintiff's termination and the alleged protected activity.[8]

---

[7] Count Two alleges that plaintiff was wrongfully terminated in retaliation for her claims of gender discrimination, in violation of the NJLAD. Pl. Third Amended Compl. ¶¶ 39–44. Count Six alleges that the same wrongful termination constituted a violation of Title VII. Pl. Third Amended Compl. ¶¶ 61–67.

[8] Defendant also claims that plaintiff did not suffer any adverse employment action as a result of her engagement in the alleged protected activity of complaining to Medco about Bhandari's discriminatory treatment. Plaintiff's eventual termination, however, is clearly an adverse employment action. *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).

12

1.   Whether Plaintiff Engaged In a Protected Activity

Defendant argues that plaintiff has not made out a prima facie claim of unlawful retaliation. Rather, the company asserts, the undisputed evidence on the record establishes that plaintiff never engaged in a protected activity because she did not communicate to anyone at Medco that she believed that Bhandari discriminated against her because of her gender.

A protected activity is any "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). This includes "making complaints to management." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). "To prove that [s]he engaged in protected activity, the plaintiff need not establish that the conduct [s]he opposed was in fact a violation of Title VII," but only that she held a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (citations and internal quotation marks omitted). In addition, all that is needed to satisfy the requirement that the protected activity was known to the employer is "general corporate knowledge that the plaintiff has engaged in a protected activity." *See Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000).

For defendant, the record demonstrates that Meyers never informed anyone at Medco that she believed that Bhandari was discriminating against her and, therefore, she could not have been retaliated against for those complaints. According to defendant, plaintiff could not recall whether she told anyone at Medco that she believed Bhandari had discriminated against her because of her gender. To support this contention, defendant points to Meyers' testimony that she discussed problems she was having with Bhandari with Wolckenhauer and Tricia

13

McDermott ("McDermott"), and that plaintiff testified that she "[did] not recall the specifics of the conversation. Generally it was a conversation about performance and career development, the first part of it was how do I get included in whatever talent management processes are going on at Medco, so I do not recall the specifics of that conversation. . . . I may have hinted that I thought it was because I was female." Meyers Dep. 387:6–388:2. Defendant further notes that, despite keeping highly detailed contemporaneous notes of her interactions with Medco's Human Resources Department and Stettin, Meyers acknowledges that nothing in those notes indicate that she apprised anyone at Medco that she was subject to gender-based discrimination. Meyers Dep. 388:3–388:6. Based on the foregoing, Defendant argues that the evidence is, at best, inconclusive as to whether Meyers ever informed defendant of her belief that she was the subject of Bhandari's gender discrimination.

Defendant further points out that Wolckenhauer and McDermott unequivocally testified that plaintiff did not raise concerns about gender discrimination in her conversations with them. According to Wolckenhauer, "[Meyers] wanted to know how to work better with her manager. It was about Amy, it wasn't about anybody else," and Meyers did not "reference[] that as being an issue related to gender." Wolckenhauer Dep. 131:12–132:20. As to McDermott, defendant claims that her interactions with Meyers concerning Meyers' issues with Bhandari were much more limited. Thus, McDermott testified that Meyers approached her because Wolckenhauer, who was responsible for human resources matters for Bhandari's group, was unavailable. Additionally, McDermott testified that, during these brief interactions, Meyers did not complain that Bhandari treated Meyers unfavorably in comparison to her colleagues. McDermott Dep. 67:5–67:17.

14

Despite defendant's arguments, however, it is clear from a further review of the record that plaintiff did make reference to gender discrimination. Plaintiff testified that she complained to Wolckenhauer that Bhandari discriminated against her on the basis of her gender. Meyers Dep. 153:6–13. According to plaintiff, because she was concerned about her relationship with Bhandari, she approached Wolckenhauer and McDermott during the first half of October 2007. Specifically, plaintiff testified that

> I discussed with [Wolckenhauer] that I was deeply concerned about the way [Bhandari] was treating me. I was concerned because I had noticed it, my colleagues within the group had noticed it, colleagues outside of the group had noticed it, that I thought and suspected it was because I was a woman, but it was definitely different. . . . I said he clearly … you know, he hasn't said anything sexual to me, but I think he deals with me differently because I'm a woman. . . . I think [Wolckenhauer] said something along the lines of uh-huh, why don't you try and address it with [Bhandari].

Meyers Dep. 153:6–156:7.

In addition, plaintiff argues that there are no magic words required to establish a protected activity. Pl.'s Br. 17. According to plaintiff, Wokenhauer's testimony that plaintiff was "highly emotional" during their meeting demonstrates that they discussed something more sensitive than talent evaluation and performance reviews. Wolckenhauer Dep. 101:14–15.

Plaintiff further testified by affidavit that she told Wolckenhauer that Bahandari "spoke to me in a disrespectful, and belittling, manner, and that he cut me off whenever I spoke, and that he did this in front of my colleagues. I also told Ms. Wolckenhauer that he treated me worse than he treated my colleagues (all of whom were men)." Meyers Aff. ¶ 19. According to Meyers, she "was crying because these issues were very sensitive and I was afraid that Mr. Bhandari and Medco would penalize me for making this complaint." Meyers Aff. ¶ 19.[9]

---

[9]    Defendant argues that plaintiff's affidavit testimony should be disregarded because, under the sham affidavit doctrine, a non-moving party cannot defeat summary judgment through its own self-serving affidavit testimony that contradicts her prior deposition testimony.

It is clear that plaintiff's testimony, and Wolckenhauer and McDermott's conflicting testimony, raise a material factual dispute as to whether plaintiff informed Medco of her belief that Bhandari was discriminating against her on the basis of her gender. That is, there is a genuine dispute of material fact as to whether Meyers engaged in a protected activity when she spoke to Wolckenhauer about the manner in which Bhandari treated her. Based on plaintiff's deposition testimony and her affidavit, a reasonable jury could find that Meyers did inform Wolckenhauer of her belief that Bhandari discriminated against her on the basis of her gender and that Meyers thereby engaged in a protected activity. *See Rule v. Brine, Inc.*, 86 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

2.   Whether There Was a Causal Connection Between Plaintiff's Complaints and Her Termination

Next, defendant contends that, even if Meyers engaged in a protected activity, the record demonstrates indisputably that there was no causal connection between plaintiff's alleged protected activity and her termination. To prove causation for purposes of a retaliatory discrimination claim, a plaintiff must show that a discriminatory animus was the "but for" cause of the adverse employment action. Causation may be proven by direct "evidence of retaliatory animus directed against the plaintiff by the defendant" or circumstantially, "by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar

---

*See Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (finding that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony"). Meyers' affidavit, however, is not inconsistent with her deposition testimony that she informed Wolckenhauer that she believed that she was subject to disparate treatment because she was a woman.

16

conduct." *Petrisch v. JP Morgan Chase,* 789 F. Supp. 2d 437, 449–50 (S.D.N.Y. 2011) (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000).

Defendant insists that the record demonstrates that there was no direct evidence of retaliatory animus. In addition, defendant argues that because plaintiff was terminated months after the alleged protected activity took place, showing causation through temporal proximity is impossible. Def.'s Br. 22.

With respect to evidence of retaliatory animus, all parties agree that there was no direct evidence that anyone at Medco expressed hostility towards Meyers because of her complaints. Nor does there appear to be any circumstantial evidence of retaliatory animus. Defendant notes that, following plaintiff's alleged complaints to Medco about Bhandari's discrimination, Meyers received a favorable performance review from Accetta. As a result of this positive review, Meyers received a larger salary increase than in previous years, a $40,000 bonus, and additional stock options and restricted stock unit grants. According to defendant, "[g]iven that [p]laintiff was given the biggest increase in compensation after her 2007 performance review, no reasonable jury could find [p]laintiff was subject to unlawful retaliation." Def.'s Br. 23.

Defendant further insists that, because plaintiff's favorable treatment negates any inference of retaliatory animus, plaintiff would only be able to prove causation based upon the temporal proximity of her protected activity and her termination. Defendant argues, however, that the passage of more than a year between the time plaintiff engaged in the alleged protected activity and her termination demonstrates a "lack of temporal proximity" between plaintiff's alleged complaints about Bhandari's discriminatory treatment and her termination and, thus, "negates any reasonable inference of retaliation." Def.'s Br. 22.

The court is not convinced that the passage of time between Meyers' complaints about Bhandari and her termination is dispositive. This is because there is evidence on the record that the temporal gap between plaintiff's protected activity and her termination were attributable to Medco's need to retain plaintiff long enough to secure her cooperation in connection with litigation that was important to the company. *See* Meyers Dep. 240:5–243:17.

As noted above, immediately following Meyers' complaints to Wolckenhauer and McDermott, Bhandari informed Meyers that she did not have a place in his group. Notably, Bhandari so informed Meyers without the consent of Stettin or anyone else at Medco. Stettin Dep. 122:14–123:18. Stettin expressed his surprise with Bhandari's decision, and assured Meyers that he would find her another position. Stettin Dep. 119:2–119:17. Meyers was then placed in Accetta's group. She was not, however, given a title or a description of her responsibilities. Meyers Dep. 216:17–217:22.

Meanwhile, through August 2008, the record indicates that plaintiff worked closely with Medco's lawyers in connection with the IMS Lawsuit. *See* Meyers Dep. 241:5–243:17. During this time, she continued to work in Accetta's group, where her performance reviews were positive. Nevertheless, plaintiff was terminated in January 2009, only a few months after her involvement in the IMS Lawsuit was complete.

Based on this sequence of events, a reasonable jury could conclude that the temporal gap between the plaintiff's complaints about Bhandari and her termination was attributable to Medco's desire that plaintiff continue to cooperate in the IMS Lawsuit. Similarly, a reasonable jury could conclude that plaintiff's positive treatment was not attributable to a lack of retaliatory animus, but rather, as a stop-gap to ensure her continued cooperation in the IMS Lawsuit until such time as it was convenient for Medco to complete its retaliation in response to her protected

18

activity. Were a jury to determine that this temporal gap was attributable to Medco's desire to

obtain Meyers' cooperation in the IMS Lawsuit, it would negate any effort by defendant to

defeat plaintiff's claims based on a gap in time between plaintiff's protected activity and her

termination. Whether this gap in time evinces that the termination was not in response to

Meyers' protected activity, or the need to keep her engaged in the IMS Lawsuit, is a question for

a jury.

### 3. Defendant's Proffered Nondiscriminatory Reason Was Not Pretextual

Next, defendant claims that, even if plaintiff has made out a prima facie case of

retaliatory discrimination, defendant has offered a legitimate, non-retaliatory reason for the

alleged misconduct. According to defendant, "[p]laintiff's position was lawfully eliminated in

an economic downsizing." Def.'s Br. 24. Defendant further argues that, because there is no

competent record evidence that this articulated reason was a pretext for unlawful discriminatory

conduct, defendant is entitled to summary judgment. Def.'s Br. 24.

As noted, under the *McDonnell Douglas* burden-shifting analysis, once plaintiff

establishes a prima facie case of retaliatory discrimination, the burden shifts to defendant to

articulate a legitimate, non-discriminatory reason for its action. If the defendant meets this

burden, the presumption of discrimination "simply drops out of the picture," and the plaintiff

must provide evidence that the articulated non-discriminatory reason is pretextual. *St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993). "[A] reason cannot be proved to be 'a pretext *for*

*discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the

real reason." *Id.* at 515. "In deciding a motion for summary judgment, the court cannot try

issues of fact but can only determine whether there are issues of fact to be tried." *Sutera v.*

*Schering Corp.*, 73 F.3d 13, 15–16 (2d Cir. 1995) (citation and internal quotation marks

omitted). Summary judgment is appropriate, however, if "no rational trier of fact could find the

articulated basis for the plaintiff's discharge to be a pretext for discrimination." *Id.* at 16.

The record contains testimony that plaintiff's position was eliminated as a cost-cutting

measure. According to Stettin, Medco decided to eliminate positions in the division under Vice

President of Care Enhancing Solutions, Christopher Bradbury ("Bradbury"), which included

Accetta's group, to address budgetary concerns. Stettin testified that "I asked [Bradbury,] and

his team for recommendations about meeting their budget for the coming year, because our

expenses were over the budget. And the recommendation to eliminate [Meyers'] position, as

well as other actions in the department, were part of their proposal to me. And I ultimately

approved that." Stettin Dep. 173:4–173:11.

Further evidence on the record demonstrates that Meyers was performing tasks for

Accetta that were below her pay grade, and that most of these tasks were completed by the end

of 2008. Accetta Dep. 65:24–66:7. Accetta testified that Meyers recognized was aware her

primary tasks involved "project management," rather than "strategy," and that such tasks were

generally performed by someone who would command a lower salary. Accetta testified that

> during conversations with me one on one, [Meyers] state[d] that she recognized
> that the role I needed help[] with was more of a project manager. And even stated
> to me that I should have two project managers for the salary that she was getting
> as a senior director, and she recognized that the workload that I had was more
> specific to project management than it was to strategy and financial modeling,
> which was her skill-set. . . . [S]he even offered to—she asked me to put her on a
> list, because during the months of November, October, there was a water cooler
> conversation about potential elimination of positions, and she did come to me and
> make that statement regarding the fact that she recognized the workload that I had
> on my plate, and a good portion of her skill-set really didn't warrant the role. It
> was more project management, project plans, getting tasks done, and two project
> managers would make more sense for me than a senior director level person.

20

Accetta Dep. 66:19–67:17.  During her deposition, Meyers confirmed her assessment that she

was over-qualified for the work she was performing for Accetta.  Meyers Dep. 247:4–247:7

("[W]e had an ongoing conversation about the fact that I was capable of more strategic work and

it wasn't there.").

Bradbury's testimony was consistent with that of Accetta and Stettin.  According to

Bradbury, in response to a request from Stettin to identify cost-saving measures, he identified

three individuals—Meyers, Karen Garvey, and Peter Hoffman.  Bradbury testified that Meyers

was chosen because "[m]any of the deliverables were completed, and the remaining work, there

were good options on where to integrate that with other individuals."  Bradbury Dep. 111:24–

112:3.  Garvey was also chosen because "[h]er activities could be absorbed by other individuals

within that group. . . .  And then secondly it was an area that we could cutback and it would not

have a material near term impact."  Bradbury Dep. 111:10–111:18.  According to Bradbury,

Hoffman was not ultimately terminated because "[Hoffman] was a sales executive, and by taking

[him] out they would have had a near and longer term impact on [Medco's] revenue growth."

Bradbury Dep. 112:8–112:11.  In addition to Meyers and Garvey, Medco also terminated Pat

Mazzone, a senior director of product services.  According to Stettin, Mazzone, aware of the

impending layoffs, volunteered to be terminated because she was approaching retirement and

found the offered severance package acceptable.  Stettin Dep. 177:4–178:7.

Based on the foregoing record evidence, defendant has met its burden of articulating a

legitimate, non-discriminatory reason for terminating Meyers insofar as it establishes that

Meyers' dismissal was part of larger cost-cutting plan, which included the termination of

additional employees.  *See Montanile v. Nat'l Broad. Co.*, 211 F. Supp. 2d 481, 487 (S.D.N.Y.

2002) (finding that cost-cutting was a plausible, non-discriminatory reason for termination of

plaintiff).  Plaintiff, therefore, bears the burden of demonstrating that there is a genuine dispute

of material fact as to whether defendant's articulated reason is pretextual.  *Weinstock*, 224 F.3d.

at 42.

      In order to demonstrate that an employer's proffered non-discriminatory reason was

pretextual "in the summary judgment context[,] . . . the plaintiff must establish a genuine issue of

material fact either through direct, statistical or circumstantial evidence as to whether the

employer's reason for discharging her is false *and* as to whether it is more likely that a

discriminatory reason motivated the employer to make the adverse employment decision."  *Gallo*

*v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994).  Accordingly, as

noted, plaintiff must proffer specific evidence "*both* that the reason was false, *and* that

discrimination was the real reason."  *St. Mary's Honor Ctr.*, 509 U.S. at 515.  For example, in

*Burger v. Litton Indus. Inc.,* No. 91 Civ. 0918, 1996 U.S. Dist. LEXIS 5560, at *41 (S.D.N.Y.

Apr. 24, 1996), the Court found a genuine factual dispute existed as to whether the employer's

claim that it terminated plaintiff in an effort to cut costs was pretextual.  In *Burger,* there was

some evidence that plaintiff was fired as part of a larger reduction-in-force layoff, which the

employer claimed was a legitimate, non-discriminatory reason for the termination.  To

demonstrate that the employer's explanation was pretextual, the plaintiff produced a

memorandum prepared by the defendant over a year prior to the reduction-in-force layoff, which

indicated that the decision to include plaintiff in the layoff was based on factors other than cost

considerations.  Based on this evidence, the Court found that there was a genuine factual dispute

precluding summary judgment.  *Burger,* 1996 U.S. Dist. LEXIS 5560, at *41 ("Since this

memorandum appears to indicate that Litton intended to terminate Burger by February 1, 1993,

over one year prior to the 1994 reduction in force layoff, a material factual dispute exists as to

whether Burger's layoff was the result of a general financial reduction in force or whether, despite the reduction in force, she was terminated for discriminatory reasons.").

Plaintiff argues that there is a dispute of fact concerning whether defendant's proffered explanation is pretextual for three reasons. First, she claims that the record evidence demonstrates that Bradbury's group performed well in 2008, based on Bradbury's testimony that his group was in the midst of 25% growth. Pl.'s Br. 2. Although plaintiff does not elaborate on this contention, she appears to be arguing that it is unreasonable for a growing business to reduce labor costs. This argument cannot be credited. Plaintiff has presented no reason why a growing business would not seek to eliminate redundant positions or otherwise cut costs, and no record evidence suggests that such common business measures are only undertaken by struggling businesses. Thus, the court is not convinced that the mere fact that a business is growing renders the decision to reduce costs pretextual. *See* Reply Memorandum of Law 11–12 (ECF Dkt. No. 59) ("Def.'s Reply") ("Medco's decision to downsize for economic purposes in order to increase profitability was a legitimate, non-discriminatory business decision. Medco was entitled to determine that eliminating plaintiff's high-paying position, when her duties could be, and in fact were, absorbed by the remaining members of her group, which was led by and consisted entirely of females, fulfilled a legitimate business goal.") (internal citations omitted). At best, whether the timing of cost reductions is appropriate is a question of business judgment and it is not the role of the court "to act as a 'super personnel department' that second guesses employers' business judgments." *Timbie v. Eli Lilly & Co.,* 429 F. App'x 20, 23 (2d Cir. 2011) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir. 2001)).

Next, plaintiff contends that "no one else in Stettin's group was involuntarily terminated" at the time plaintiff was dismissed. Pl.'s Br. 19. The record, however, establishes that Garvey

was also involuntarily dismissed. Bradbury Dep. 111:10–111:18. Moreover, although Mazzone volunteered to be terminated, she did so because layoffs were imminent, and the record indicates that had she not volunteered, either she or another employee from Bradbury's group would have been eliminated along with Garvey and Meyers. *See* Stettin Dep. 177:10–178:9. Accordingly, plaintiff's contention that she alone was fired is factually inaccurate and insufficient to meet her burden of demonstrating a triable issue of fact concerning whether defendant's proffered reason for plaintiff's termination was pretextual.

Finally, plaintiff contends that "the evidence also shows that by 2008 Medco had 'bundled' Rational IQ with Rational Med [(two products that Medco had developed)]. . . . Plaintiff had conducted trainings on both products, and was one of the most knowledgeable employees on both Rational IQ and Rational Med, making her more (not less) valuable at that time." Pl.'s Br. 20. In other words, plaintiff argues that she was uniquely qualified to help the company at the time of her termination and, thus, she must have been terminated as retaliation for her complaints about Bhandari. Such a claim is insufficient to demonstrate pretext. As the Second Circuit has instructed,

> [w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."

*Byrnie*, 243 F.3d at 103 (citations omitted). Plaintiff's showing here, amounting to little more than her personal opinion of her qualifications, is insufficient to demonstrate that no

reasonable person could have chosen to dismiss her over the other employees who were not subject to the layoffs.

Based on the foregoing, defendant's motion for summary judgment is granted with respect to Counts Two and Six because defendant has demonstrated a legitimate, non-discriminatory basis for plaintiff's termination, and there is no evidence on the record sufficient to raise a genuine factual dispute as to whether defendant's proffered reason for her termination was pretextual.

V.     Plaintiff's Retaliatory Refusal to Rehire Claim Fails As a Matter of Law

Plaintiff claims that "[d]efendant further retaliated against [p]laintiff when it terminated its efforts to hire her because her discrimination and retaliation claims were still pending." Pl.'s Br. 24. Two undisputed facts demonstrate that Medco's failure to rehire Meyers was not retaliation against Meyers for bringing this lawsuit. First, the record establishes that Medco did not have an open and vacant position for which Meyers was qualified at that time. Kornwasser Dep. 81:5–81:15 ("I called Ms. Meyers just to let her know I thought there may be an opportunity. If Ms. Meyers wanted the opportunity, than [sic] I would have brought the subject up with Business Development and they would have had to make sure that they had room on their budget to hire a consultant. But at the time of the call I was unaware if they had room or not on their budget."); Meyers Dep. 434:18–435:9 ("[Kornwasser] wanted to know how I was doing and he said I don't know where things are, but some of the contracts that you worked are coming due. Perhaps, there's an opportunity for you as a consultant. . . . He said I don't know where things are with Medco, but if there's a gap, maybe this would fill it."). Thus, it is apparent that Meyers was contacted by Kornwasser to discuss the possibility of bringing her on as a

consultant.  According to Kornwasser's testimony, however, (1) the telephone call to Meyers was based on his own initiative, (2) he was unaware whether the potential position was even available, and (3) he had not discussed the possibility of a consultant position for Meyers with anyone at Medco.  Kornwasser Dep. 83:19–83:21.

Indeed, the potential position Kornwasser had in mind was with the Business Development division, of which he was not a part.  Kornwasser Dep. 79:12–18.  Moreover, Kornwasser testified that he had no authority to create and offer the position to Meyers. Kornwasser Dep. 81:5–15.  Importantly, Medco never filled this hypothetical position or even accepted applications for that position.  In other words, there is no evidence on the record that any vacant position ever existed.  Rather, Kornwasser's discussion with Meyers in February 2011 was nothing more than an attempt to help a former colleague brainstorm potential opportunities.  *See Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n.44 (1977) ("Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from . . . the absence of a vacancy in the job sought."); *Finkelshteyn v. Staten Island Univ. Hosp.,* 687 F. Supp. 2d 66, 84 (E.D.N.Y. 2009) ("Fatal to this claim is Finkelshteyn's basic failure to show, as he must, the actual availability of an open employment position.").

Second, there is no evidence that Meyers ever applied for the putative position Medco refused to rehire her for.  Unless an application for a position would be demonstrably futile, the courts of this Circuit require that a plaintiff "allege that she or he applied for a specific position or positions and was rejected therefrom."  *Brown v. Coach Stores,* 163 F.3d 706, 710 (2d Cir. 1998); *see also Gaffney v. Dep't of Info. Tech. & Telecomm.,* 536 F. Supp. 2d 445, 459–60 (S.D.N.Y. 2008) ("As part of plaintiffs' *prima facie* cases in failure to hire claims, courts

26

generally require that the plaintiff establish that she applied for the specific position but did not receive an offer.") (citations omitted). Accordingly, defendant's motion is granted with respect to Counts Seven and Nine.

VI.   Defendant Is Not Entitled to Summary Judgment on Its Counterclaim for Unjust Enrichment

Defendant contends that it is entitled to summary judgment on its claim for unjust enrichment because "[p]laintiff had no entitlement" to payment of her performance bonus for 2008. Def.'s Br. 29. Rather, defendant insists that this bonus payment was "made in error" because "Medco had no obligation to pay these monies to [p]laintiff **unless and until** [p]laintiff signed the Release of Claims." Def.'s Br. 29. Interestingly, rather than relying on its severance agreement with plaintiff, defendant relies on the cover letter from Medco to plaintiff enclosing the Medco Health Solutions, Inc. Severance Plan. *See* Letter from Medco to Meyers (Jan. 8, 2009), Bennett Decl. Ex. E at D-0045 (the "Termination Letter"). The letter, however, is ambiguous as to whether payment of the performance bonus was contingent upon execution of the Release of Claims.

> The Termination Letter provided, in relevant part,
>
> You are eligible for certain pay and benefits under the [Medco Severance Plan]. Under the terms of the Plan, you will receive severance pay and benefits for a period of 20 weeks . . . and outplacement benefits for 6 months. In addition, you will receive a discretionary bonus of $40,000.00 for performance year 2008. All payments are subject to applicable withholding. *In order to receive severance pay and benefits under the plan you must sign and return the enclosed Release of Claims.* Your severance payments will not commence until after the 7 day revocation period for the Release of Claims has expired and the Release of Claims has become effective. *The bonus amount will paid in a lump sum soon as practicable following the effective date of the Release of Claims.*

Termination Letter at D-0045 (emphasis added).

27

Indeed, under the terms of the Medco Severance Plan, Severance Pay is a defined amount of the employee's wages during employment, paid for a specific period of time following termination (e.g. "2 Weeks of Pay per complete year of Continuous Service up to 5 years and 1 Week of Pay per complete year of Continuous Service over 5 years"). Attachment C to Termination Letter, Bennett Decl. Ex. E at D-0062 ("Attachment C"). Outplacement Benefits are defined as "outplacement counseling or other outplacement services." Attachment C at D-0062. Finally, Severance Benefits are defined as "medical, dental, prescription drug and basic life insurance coverage during the Severance Pay Period." Attachment C at D-0063. Accordingly, pursuant to the Medco Severance Plan documents it does not appear that the performance bonus was covered by the severance plan at all.

Further, the record is in conflict as to how Meyers' bonus was calculated and awarded, and whether payment of the bonus was conditioned upon execution and return of the Release of Claims. Plaintiff testified that her "understanding was that [she] would be paid [her] bonus because [she] had worked the entire year of 2008" and that she would be "paid additional . . . severance compensation if [she] signed the release." Meyers Dep. 287:17–24. Kelly Webber, Medco's Vice President of Corporate Human Resources and Staffing, indicated that plaintiff's bonus was given to those "who may have warranted receiving a bonus for the performance year" based on a review of the quality of their work, but also that the award of the bonus was contingent upon execution of the Release of Claims. Webber Dep. 19:4–19:21. The testimony of Edward Redling, another Medco employee involved in human resources decisions, was that severance bonuses awarded in the year at issue here were only given to terminated employees who were on the same level as Meyers, awarded regardless of the quality of employee performance, in the same amount "as the prior year[s] level of bonus, [and] conditioned on the

28

signing of the general release of claims." Redling Dep. 94:6–96:10. Thus, it is in dispute whether the payment of Meyers' bonus was in consideration of the execution and return of the Release of Claims, in consideration of plaintiff's 2008 performance, or both. Moreover, defendant cites no law indicating that it could condition payment, including by the Release of Claims, if the bonus was issued in consideration of Meyers' 2008 work.

Therefore, there is a genuine dispute of material fact as to whether payment of the bonus could have been or was conditioned upon execution of the Release of Claims and, if so, whether that condition was lawful. For this reason, defendant's motion for summary judgment with respect to its counterclaim for unjust enrichment is denied.

CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is GRANTED, in part, and DENIED, in part. The motion is granted with respect to Counts One through Nine in the Third Amended Complaint, and those claims are dismissed. Defendant's motion is DENIED with respect to plaintiff's counterclaim for unjust enrichment, which will proceed to trial in accordance with the applicable scheduling order.

It is SO ORDERED.

/S/      Richard K. Eaton
Judge

Dated:      October 3, 2012
           New York, New York